[No. 27730. Department Two. April 5, 1940.]

M. R. JONES *et al., Appellants,* v. THOMAS MALLON *et al., Respondents.*[1]

[1]Reported in 101 P. (2d) 332.

*Rex S. Roudebush,* for appellants.

*Ballinger, Clark, Mathewson & Force* and *Binns & Cunningham,* for respondents.

STEINERT, J.—Plaintiffs brought suit to rescind a conditional sale contract wherein they had agreed to purchase from the principal defendant herein a Ford truck equipped with hoist and body, and to recover the amount of purchase installments previously paid thereon. At the conclusion of the trial, without a jury, the court rendered an oral decision in favor of defendants, and thereafter entered judgment dismissing the complaint. Plaintiffs have appealed.

Since appellants sought equitable relief, findings of fact, though permissible, were not necessary. *McClure v. Calispell Duck Club,* 157 Wash. 136, 288 Pac. 217.

So far as the record before us discloses, no findings were made, and the oral decision does not fully indicate the trial court's views concerning many of the factual issues argued in the briefs. We shall therefore state, first, those facts which are undisputed, and, then, such additional facts as appear to us, from a reading of the

entire record, to be established by the preponderance of the evidence and the reasonable inferences to· be drawn therefrom.

Appellant A. W. McDonald is a mechanic with many years' experience in operating and repairing automobiles and motor trucks. Appellant Jones is a carpenter, who became associated with McDonald in the transaction hereinafter related, but who had no financial investment therein. Respondent Thomas Mallon is a Ford dealer doing business in Tacoma under the name of Mallon Motors.

On or about October 8, 1938, McDonald called at Mallon's place of business with the view of purchasing a truck, which McDonald and Jones intended to use in a contemplated joint enterprise. Mallon showed McDonald a new, 1938, one and one-half ton Ford truck chassis. McDonald desired to have the chassis equipped with a box hoist and a body of a special size, and inquired of Mallon what the truck thus equipped would cost. Mallon did not manufacture or deal in such equipment, and therefore at once telephoned to Isaacson Iron Works, which was engaged in that business in Seattle. From the information thus obtained, the total cost of the truck and equipment was computed at approximately sixteen hundred dollars. It was thereupon agreed that McDonald should drive the truck to Seattle, where a box hoist and body such as McDonald desired were to be installed by Isaacson Iron Works. An initial cash deposit on the purchase was made at that time.

McDonald drove the truck to Seattle and, after some discussion with certain of the employees of Isaacson Iron Works, left orders for the installation of a Woods' hoist and an oversize body having dimensions of ten feet in length and seven feet in width, and a capacity of two and one-half cubic yards. On completion of

the installation, which was made within the next two or three days, McDonald drove the truck from Seattle back to Tacoma and, in company with Mrs. McDonald and Jones, again saw Mallon.

A conditional sale contract, dated October 13, 1938, covering the truck, hoist, and body, was executed by Mallon, as seller, and by Jones and Mrs. McDonald as purchasers. Mr. McDonald signed as guarantor of payment of the contract. The total purchase price stipulated therein was $1,671.84, of which three hundred dollars was acknowledged as a cash payment and one hundred and fifty dollars as a trade-in allowance. The balance was to be paid in monthly installments of $67.88.

The conditional sale contract, which was on a printed form, contained the following provision:

"Purchaser agrees that he has examined the property herein described and is using his own judgment as to its condition, fitness and value; that the Seller makes no representation, statement, warranty, or guaranty as to its condition, or with reference to said property; that the execution of this contract is not procured by any statement, representation or agreement not herein contained, and that each and every condition and agreement relative to the subject matter of this contract is contained herein."

By other provisions in the contract, the purchasers agreed not to use, nor permit use of, the truck for hire during the life of the agreement, and, further, to maintain the property in good condition and repair, reasonable wear and tear thereof excepted, and to use and operate the truck in a careful and prudent manner.

The parties are in accord that the Ford Motor Company issues a standard form of warranty for the protection of purchasers of its products. The warranty, a copy of which was introduced as an exhibit in the

case, relates to all such parts of new Ford automobiles, trucks, and chassis as shall exhibit defects of workmanship or material within ninety days from date of original delivery of the vehicle and before such vehicle has been driven four thousand miles under normal use and service. However, the Ford Company accepts no responsibility in case the vehicle is altered outside its own factories or branch plants; and if the purchaser uses, or allows to be used, on the vehicle, any parts that have not been made or supplied by the company, the warranty becomes void.

Upon acceptance of the truck by McDonald, he let it for hire, to be used in hauling and spreading gravel upon a road which the Federal government was then constructing. The truck was operated by two Works Progress Administration employees, working in shifts.

Beginning with the third day and continuing over a period of sixty days, the truck broke down three times. The principal complaint made by appellants was with reference to the hoist mechanism and its effect upon other parts of the truck. The machine was accordingly returned for repairs, to Mallon three times, and to Isaacson Iron Works once, and, in each instance, certain repairs were made without charge to appellants. Finally, in February, 1939, appellants, after consulting an attorney, returned the truck to Mallon, declined to make any further payments, and demanded the return of the money paid, amounting to $585.76.

The contract was originally assigned by Mallon to respondent National Bank of Washington, but, at the time of the trial, it had been reassigned to Mallon.

Thus far, the facts are not in dispute. However, they do not tell the whole story. There was considerable evidence of a conflicting nature with respect to certain details which have a distinct bearing on the controversy. In substance, they relate to the follow-

ing matters: Whether the contract was signed before or after the original installation of the hoist and body; whether that mechanism was installed pursuant to McDonald's own directions, or whether he relied on the judgment of Isaacson Iron Works; whether McDonald advised Mallon or Isaacson Iron Works that the truck was to be used for hauling gravel, or merely for general utility purposes; whether or not it was represented to McDonald that the truck was capable of transporting loads of gravel commensurate with the size of the body; whether or not, at the time of the purchase, McDonald demanded of Mallon, and was promised, a so-called "money back guarantee" to cover the hoist and body, in addition to the customary Ford warranty covering the truck; and whether the collapse of the truck resulted from such use as was reasonably intended, or whether it was caused by careless driving and abuse of the vehicle.

According to the oral decision, the court was of the opinion that McDonald never advised either Mallon or Isaacson Iron Works that the truck and mechanism were to be used for hauling gravel, which is much heavier than coal or wood or other similar material, but that it was his declared purpose, and the understanding of all the parties concerned, that the truck was to be used only for general utility needs. It was also the opinion of the court that, if there was a request on the part of McDonald for any guaranty or warranty, it was that the ordinary Ford warranty should be made applicable to the entire truck, and not merely to the chassis. Our study of the record convinces us that the court was correct in each of those particulars.

Upon the other factual issues, referred to above, we have no light or guide as to the court's conclusion,

and we have therefore considered the weight of the evidence, as best we can, from the cold, flat record.

In our opinion, the great preponderance of the evidence, as well as the reasonable inferences to be drawn from what was admitted to have transpired, is to the effect that the contract was signed *after* the installation was completed and at the time that McDonald took delivery of the truck; that the body and hoist were selected by McDonald, and that, in such selection, he exercised his own judgment and did not rely upon the judgment or representations of Isaacson Iron Works; that the truck, as equipped, was never intended, by either Mallon or Isaacson Iron Works, to be used for hauling gravel to the full extent of the cubic capacity of the body; that, in fact, Isaacson Iron Works advised McDonald that a body of that size, installed upon a one and one-half ton Ford truck, was suitable for general utility purposes, but not for hauling gravel, unless the load was limited; that Mallon never promised McDonald a "money back guarantee;" and that the collapse of the truck was not caused by any inherent defect in its mechanism, nor resulted from a proper use of the vehicle, but was brought about by the abusive treatment which the truck received.

No doubt, McDonald, from the outset, planned to secure employment for the truck in road construction work and intended to use the vehicle for that purpose to its full cubic capacity. He evidently desired the larger body in order to secure a greater return from the operation of the truck. Those considerations, however, were simply his own ideas and concerns. He was not misled by any representations made to him, nor did he communicate his intentions to those with whom he dealt in the purchase.

McDonald then proceeded to hire out the truck to others, which in itself was in violation of the contract.

It also appears that the truck was operated by drivers over whom he had no control or supervision.

The evidence discloses that the truck was customarily loaded with gravel to the full cubic capacity of the box. Early in its operations, the truck, while loaded, became mired to the depth of the hubs on one side, and effort was made to drive it forward from that position under its own power. It is not at all surprising that, under such treatment, the vital parts of its mechanism became warped or that such undue strain resulted in ultimate collapse. An enlightening bit of evidence is that, shortly after the truck had been surrendered to Mallon, it was resold, and, according to the testimony of the purchaser, who replaced the body with one of smaller capacity, the machine has operated satisfactorily ever since.

We are mindful of the fact that, with respect to the matters adverted to in the last four preceding paragraphs, we do not have the benefit of any positive findings by the trial court, and that we cannot fully evaluate the credibility of the witnesses. However, it can likewise be said that there are no findings favorable to appellants on those matters, and our conclusions thereon are all in support of the judgment, and not against it.

We come, now, to the legal phases of the case. Appellants contend (1) that there was a breach, on the part of respondents, of an implied warranty of the quality or fitness of the truck for the particular purpose for which it was supplied, and (2) that respondents breached their "money back guarantee."

■ Rem. Rev. Stat., § 5836-15 [P. C. § 6227-15], on which appellants rely, provides:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particu-

lar purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. . . . "

The statute, when applied to the facts as above outlined, carries its own refutation of appellants' contention. As already stated, our study of the evidence convinces us that McDonald did not make known to either Mallon or Isaacson Iron Works the particular purpose for which the truck was to be, and was, used, and that he did not rely on the skill or judgment of either of those parties.

For these reasons, the two cases cited by appellants, *Clark v. Parker,* 155 Wash. 624, 285 Pac. 652, and *Foss v. Golden Rule Bakery,* 184 Wash. 265, 51 P. (2d) 405, are not in point.

The case at bar falls within the generally accepted rule that, where the buyer enters into an executory contract for the purchase of goods exactly described, or makes an executed purchase of such goods, he cannot hold the seller, even though the seller be the manufacturer of the goods, as warranting that they are fit for any more special purpose than that which merchantable goods of the agreed description necessarily fulfill. By exactly defining what he wants, the buyer has exercised his own judgment instead of relying upon that of the seller. 1 Williston on Sales (2d ed.), 461, § 236. See, also, Annotation in 59 A. L. R. 1180, 1188.

There is, yet, another conclusive answer to appellants' contention. Rem. Rev. Stat., § 5836-71 [P. C. § 6227-71], provides:

"Variation of implied obligations. Where any right,

duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

The contract here in question not only stipulated that the purchasers had examined the particular property and were using their own judgment as to its condition, fitness, and value, but specifically provided that the seller made no representation, statement, warranty, or guaranty as to its condition, or with reference to the property described; and, further, that the execution of the contract had not been procured by any statement, representation, or agreement not therein contained, and that every condition and agreement relative to the subject matter was included in the agreement itself.

The parties had the right to enter into, and bind themselves by, such an agreement.

When a seller and a buyer deliberately enter into a contract wherein the seller positively and expressly refuses to give any warranty, and the contract is not induced by fraud, no warranty of any kind can be implied by law. *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428; *Marks v. Kucich*, 181 Wash. 73, 42 P. (2d) 16.

The oral decision of the trial court repels any question of fraud in this case, and the evidence fully supports that conclusion.

■ Appellants' contention with respect to an alleged "money back guarantee" is met by our conclusion from the evidence, expressed above, that no such promise was ever made by Mallon.

However, assuming, merely for the sake of argument, that some such expression was used, either

by McDonald or by Mallon, the record is barren of any evidence as to what was meant by that term. Obviously, it might have many different meanings and limitations, dependent upon the circumstances of the particular case. The trial court endeavored to elicit from the parties what was thereby meant, but was unsuccessful; nor was the court able to gain any definite aid from its own search of the authorities. We, likewise, find nothing to enable us to fix any definite, precise, legal meaning upon the term. Appellants have made no case on that basis.

The judgment is affirmed.

BLAKE, C. J., BEALS, GERAGHTY, and JEFFERS, JJ., concur.