[No. 41500.    En Banc.    April 22, 1971.]

RICHARD BERG, *Petitioner*, v. ARTHUR STROMME *et al.*, *Respondents.*

*Horton, Wilkins, Horton & Bennett,* by *Hugh B. Horton,* for petitioner.

*Peterson, Taylor & Day* and *Stanley D. Taylor,* for respondents.

HALE, J.—Plaintiff bought a new Pontiac station wagon automobile but claimed that it had so many things wrong with it he felt justified in rescinding the deal. When he tried to return the car and get a refund, the dealer refused, saying not only that the sale carried no warranty of quality but that plaintiff had in writing waived all warranties of fitness, express or implied, and had acknowledged that he was buying without any guarantee whatever.

Seeking damages for depreciated value, costs of repairs and time loss, plaintiff brought this action against the dealer who had sold him the automobile. At the close of plaintiff's case, the superior court on defendant's motion ordered a dismissal with prejudice. The order of dismissal specified two grounds: (1) that the article had been purchased by trade name and that the sale was, therefore, without warranty of fitness; and (2) that plaintiff had signed a disclaimer of warranty.[1] The Court of Appeals

---

[1] The judgment and order of dismissal states, in part: "1. That the article purchased by the plaintiff was sold by trade name and according to law there is no implied warranty of fitness in such a sale, and

"2. That the plaintiff signed a disclaimer of warranty and therefor under the law is not entitled to rely on implied warranty of fitness."

affirmed, with one judge dissenting. *Berg v. Stromme*, 1 Wn. App. 916, 465 P.2d 181 (1970). We granted review (78 Wn.2d 991, (1970)), and reverse the Court of Appeals and the superior court.

Defendants owned and operated the Pontiac-Cadillac dealership in Pasco under the name of Stromme Motors. Plaintiff, a practicing physician and psychiatrist, discussed with them in 1964 the purchase of a new 1965 model Pontiac Safari station wagon. Equipped with the large engine and numerous items of extra equipment, the car was intended by the parties to have adequate size, weight and power for towing a fully loaded 3-horse trailer. The parties were not business strangers for Dr. Berg had once bought a 3-horse trailer and on prior occasions had purchased automobiles from the Stromme dealership.

As the Court of Appeals states, the record shows that, before making the purchase, plaintiff had informed defendant of his particular needs and the uses to which he would put the new car, and that defendant recommended he buy the Safari with the large engine and numerous items of optional equipment on it. So equipped and accoutred, this particular new car, they asserted, would satisfactorily meet the doctor's general requirements for family use and in the practice of his profession, and would fulfill his needs as a horse breeder in transporting his horses by trailer.

Evidence of conversations with and representations by the dealer as to the particular capabilities of the new car, however, while admissible, do not in this instance determine defendant's liability for the buyer did not rely on the seller's judgment in buying this particular car. Generally, if a buyer communicates to the seller his particular needs and the purposes and uses to which the article will be put and relies upon the seller's judgment and representations that the article will fulfill these needs and meet the buyer's particular requirements and will perform the work and uses for which it is being bought, the law recognizes an implied warranty that the article will meet the described standards. But proof of such representations is not essential

to plaintiff's recovery in the present case for even though the conversations and representations were material and relevant to prove the contract of purchase, they do not, as we view the matter, govern or control the rights and duties of the parties. The issue, as we see it, is whether the buyer, despite the printed disclaimer of warranty, was entitled under the circumstances and conditions of the purchase, to receive delivery from the dealer of a new automobile that would operate with reasonable efficiency, safety and comfort. Evidence of the seller's representations were relevant to this issue, however, because it shows that the purchase resulted from negotiations, item by item, as to the color, size, weight, horsepower and body style of the vehicle and the kinds of optional extra equipment to be put on it, such as power brakes, power steering, tilt-steering wheel, softray glass, power-operated rear window, power seat, air conditioning, superlift shock absorbers—and a host of other items of extra equipment not included in the standard price of the car of that size, type and model.

The printed documents constituting the written agreement between the parties and the execution of them in writing will show, we think, why printed disclaimers of warranty in the purchase of new automobiles are now regarded with increasing disfavor by the courts. *Norway v. Root,* 58 Wn.2d 96, 361 P.2d 162 (1961). Although competent parties may make any lawful contract they choose, there exists a strong presumption that the buyer, in negotiating the purchase of a brand new car from a dealer, after discussing and agreeing upon all of the details as to its style, type, price, equipment, accessories and condition of delivery, would not in the same agreement negate and undo his bargain by disclaiming the right to a car of merchantable quality.[2] Merchantable quality in a new car means a car

---

[2] At the time of this purchase, RCW 63.04.160 of the Uniform Sales Act was in effect.

(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods

that is reasonably safe, trouble free and dependable (*Appleman v. Fabert Motors, Inc.,* 30 Ill. App. 2d 424, 174 N.E.2d 892 (1961); *Fillet v. Curry,* 12 App. Div. 2d 519, 207 N.Y.S.2d 522 (1960)); and that it is reasonably suited for the purpose for which it was manufactured. *Paton v. Buick Motor Div., Gen. Motors Corp.,* 401 S.W.2d 446 (Mo. 1966).

Nothing in the purchase order form other than the printed disclaimer indicates that the purchaser here intended to bargain away or waive his right to a serviceable automobile. The price of the car, without optional equipment, as written in ink on the purchase order form, was $3,632. Nearly 40 separately listed items—handwritten in pen and ink on the same order form—described and priced the items of extra optional equipment to be added to the car, these running from a vanity mirror at $1.45 to air conditioning at $430.40, with such in-between devices as power brakes, $43; wind deflector, $26.90; power seat, $96.84; tilt steering, $43.04. Optional items brought the total cash price to $6,048.14. Thus, the extra equipment, specifically ordered, item by item, with the price of each set opposite each, all in handwriting, nearly equaled the cost of the vehicle alone.

Although the trial court reached a different conclusion, the purchaser here did not, we think, buy "a specified article under its patent or other trade name" as contemplated either by the Uniform Sales Act (RCW 63.04.160(4)),[3] Washington case law (*Long v. Five-Hundred Co.,* 123 Wash. 347, 212 P. 559 (1923)), or the general law of this country. 1 S. Williston, Sales § 236a (1948 ed., 1970 supp.). Nor, as earlier noted, does the record disclose reliance by Berg upon the seller's assurances or

---

shall be of merchantable quality.
Repealed, Laws of 1965, Ex. Ses., ch. 157, § 10-102(1)(a)(xii), p. 2589, effective June 30, 1967.

[3]RCW 63.04.160(4):
   (4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.
Repealed, Laws of 1965, Ex. Ses., ch. 157, § 10-102(1)(a)(xii), p. 2589, effective June 30, 1967.

representations that the automobile was adapted to the conditions described and would perform the work for which defendant intended to use it. *Webster v. L. Romano Eng'r Corp.*, 178 Wash. 118, 34 P.2d 428 (1934). It shows rather, aside from the seller's representations and suggestion that the station wagon would effectively and successfully tow a 3-horse trailer for long distances, that this brand new Pontiac station wagon was sold on the implied warranty that it would with reasonable efficiency, safety and comfort perform all of the functions and render all of the service that a reasonably minded purchaser of a brand new car had a right to expect of it. Accordingly, we are of the view that the trial court was in error in concluding that this sale fell within that provision of the Uniform Sales Act (RCW 63.04.160) which states that there is no warranty of fitness in the sale of a specified article under its patent or other trade name. We note that the Court of Appeals did not compound this error for it affirmed the judgment solely on the basis of a written waiver of warranty. *Berg v. Stromme*, 1 Wn. App. 916, 465 P.2d 181 (1970).

The order of dismissal was entered after the court had received substantial proof that this brand new car was not reasonably fit for the purpose for which it was sold—*i.e.*, a serviceable automobile capable of transporting a driver and passengers with reasonable efficiency, comfort and security upon the roads and highways of the state. There was proof of serious trouble in the car shortly after its delivery in February, 1965. The motor ran roughly and unevenly, and it clattered; the car steered inaccurately and would veer at times; it overheated under normal driving conditions; the turn signals were defective; and the car accelerated unevenly and did what is called "surging." Its air shock absorbers were defective, and the brakes failed after only 4 months' normal use. The shift lever did not work properly, and for no apparent reason the car stalled several times in traffic. The shift indicator showed the car at times to be in neutral when it was actually in drive. The windows needed fixing, and the heater did not work properly.

A safety engineer testified that the car was dangerous to drive either during daylight or darkness. Additionally, there were minor defects such as scratches on the paint and loosely secured chrome and molding. Plaintiff returned the car to defendant periodically for repairs, and it spent 20 days during the first 4 months after delivery—a total of 45 days before the first year of ownership had expired—in defendant's repair shop.

The trial court and the Court of Appeals based their decisions on the written statement above the plaintiff's signature on the purchase order and conditional sale contract that no warranties, express or implied, had been made by the seller, or as stated in the judgment of dismissal, "That the plaintiff signed a disclaimer of warranty and therefor under the law is not entitled to rely on implied warranty of fitness."

The defense of written waiver of warranty invites a detailed examination of the order form signed by the plaintiff February 8, 1965. The purported printed waiver appears in the automobile sales order which the plaintiff, after discussion and negotiation with defendant, had signed at the bottom of the first or major page. On its major side, the order form consisted almost entirely of blank lines and spaces containing printed notations—designed to be and which were filled in in handwritten words and numbers, presumably by one of the defendant's salesmen or by the prospective buyer. All items of contract sufficient to identify the car by name, kind, style, size, power and all optional extra equipment on it were handwritten or hand printed in the blank spaces of the order form, including the name and address of the purchaser, the make, type and engine number of the car, along with descriptive names of 40 separate items of equipment and attachments with a price set opposite each in handwriting. Also set forth in handwriting were four itemized labor services each separately priced, with the costs of these services totaled in handwriting. Right

below a merger clause[4] on the major side of the form, Dr. Berg and defendant's agent had signed the contract for the purchase and sale of the automobile.

The reverse side (or "back hereof") of the sales order form referred to in the merger clause was a solid mass of even sized and style of printing from top to bottom divided in two columns by a center space a little larger than the side margins. Without indentation for paragraphing, it set forth in block form 15 numbered and itemized terms of contract, the last of which contained subordinate unindented paragraphs running from 15(a) to 15(f), inclusive. This reverse side contained no spaces whatever for signatures, filling in, interlining, or references to other documents. It had no blank spaces, signature lines or other devices by which one would indicate assent, concurrence or agreement.

The printed material on the reverse side of the order, among other things, said that the agreement was not valid unless signed by an executive of the company; that verbal promises or representations of the salesman were not binding; that the dealer did not warrant the correctness of either the speedometer reading, mileage, year of manufacture or model of automobile; that if the buyer failed to complete the purchase, he forfeited his trade-in or down payment to the extent that they equalled one-third of the purchase price—in this case over $2,000—as liquidated damages; that the dealer was not responsible for delay caused by strikes, riot, war, shutdowns at factory, or other delays caused by conditions beyond his control; and that price increases during the interim caused by changes in taxes or imposed in the meanwhile by the manufacturer would be absorbed by the purchaser, and that the dealer was not to be held liable for changes in design or models

---

[4]"I have read the matter printed on the back hereof and agree to it as a part of this order the same as if it were printed above my signature. The front and back of this order comprise the entire agreement pertaining to this purchase, and no other agreement of any kind, verbal understanding or promise whatsoever, will be recognized. Receipt of a copy of this order is hereby acknowledged."

during the delay even if the buyer disapproved of them. Also in the first column, reverse side, the purchaser purported to agree that he "hereby certifies that he (or she) is twenty-one years of age or over, and is fully competent to make this agreement," and that the purchaser authorized the dealer to place insurance on the car with a loss payable clause for the benefit of the mortgagee only and "affords no protection whatever for the purchaser's interest." This last provision did not specify who should pay the premium other than that it be "included" in the contract. Item 11 ended the first column by stating that purchaser did not then and would not need any extension of credit other than what was shown on the reverse side. So much for the first column.

The second column of the reverse side began with a provision that if the dealer should teach the purchaser to drive, the former would be held harmless for any of the instructor's negligence, and that the instructor was the servant of the purchaser. Then followed a provision that the purchaser guaranteed all credit statements made by him to be true, and promised to pay all attorney's fees and costs in connection with any legal action brought by dealer to enforce the purchase order agreement. Items 15(a) through 15(f) consisted of a solid mass of printing concerning the trade-in vehicle, including the purchaser's acknowledgment that in many instances the market value of the trade-in was considerably different from the allowance shown on the order.

There, among the 11 items of these printed conditions on the reverse side in the first column, lay the principal basis for the defense of written waiver of warranty. Item 3 of the 11 stated:

> There is no guarantee on the automobile in connection with this agreement. The purchaser has no guarantee whatsoever unless a separate written agreement is obtained at the time of sale. This applies to new cars as well as used cars. The purchaser must have a written guarantee in his possession to secure an adjustment.

Defendant dealer also relied on a printed disclaimer of

warranty provision in the conditional sale contract signed by the plaintiff as purchaser. There, taking up but 1 of 26 lines of mass-printed material in the printed conditional sale contract form, among 5 printed paragraphs which occupied nearly one-half the entire page, was the second paragraph, reading:

No warranties, express or implied, have been made by the Seller unless endorsed hereon in writing.

The purported disclaimers of warranty in the conditional sale contract form and the waiver of warranty in the purchase order form highlight the absurdity of a rule of law which elevates these bland and substantially meaningless terms and conditions above the individually and expressly negotiated terms and conditions, and gives them controlling effect over specifically agreed upon items and conditions of the contract. To adhere to such a rule means that the law presumes that the buyer of a brand new automobile intends to nullify in general all of the things for which he has specifically bargained and will pay. We would presume the buyer does just the opposite.

The record shows that the parties reached an agreement as to the size, style, color, power and model of the automobile; they agreed, item by item, on the kinds of extra equipment to be added to and made a part of the new car and the price the buyer would pay for each one. The record does not show that they ever discussed, contemplated or agreed that the buyer intended to waive his right to delivery of a new car of merchantable quality, nor that the seller, aside from the printed statements, intended to exact such a waiver.

It is error, we think, to hold the buyer in the purchase of a brand new automobile to such a printed waiver of quality or capability where neither party is shown to have referred to it in the contract and where the waiver has not been included among all of the specific terms and conditions particularly written by the parties into the contract. Such waiver, even though printed, should not be allowed to arise from the fine print to haunt the buyer of a new car

unless he has agreed to be bound by it with the same degree of explicitness that he bound himself to the other vital conditions of the contract of purchase.

█ ██ This court has held that a merger clause will not be enforced where it does not in fact express the true intentions of the parties. *Black v. Evergreen Land Developers, Inc.*, 75 Wn.2d 241, 450 P.2d 470 (1969). There, noting *Norway v. Root, supra,* we said that "the recent trend of the courts has been to discredit fine print clauses when to enforce them would be against public policy." We think it a sound rule, therefore, that, when a purchaser discusses with the seller of a new article and makes a definite part of the contract many variable items such as size, shape, power, color and items of extra equipment or adornment not ordinarily a part of the article but attached to it at the purchaser's option and only upon his explicit assent and agreement and thereby includes them specifically in the contract of purchase, it is presumed that the purchaser does not intend to waive any warranties, implied or express, that the article and the equipment will perform or will reasonably accomplish the function for which it was sold and purchased. In this instance, while the new Pontiac Safari station wagon had the general lines, appearance and attributes of a station wagon automobile and seemingly would operate as a new automobile, it did not do so with reasonable safety, efficiency and comfort. Plaintiff bought but, therefore, did not receive a brand new automobile.

Parties to an agreement may make any contract that comports with general law, and if a "seller positively and expressly refuses to give any warranty, and the contract is not induced by fraud, no warranty of any kind can be implied by law." *Jones v. Mallon,* 3 Wn.2d 382, 101 P.2d 332 (1940), approved in *Lent v. McIntosh,* 29 Wn.2d 216, 186 P.2d 626 (1947). *Cf., McInnis & Co. v. Western Tractor & Equip. Co.,* 63 Wn.2d 652, 388 P.2d 562 (1964). But to come within these principles, the burden is upon the dealer to show with particularity just what the buyer is waiving,

that is, which particular defects or conditions the purchaser of a brand new automobile explicitly waives.

Thus, in the sale of a brand new automobile, there does exist an implied warranty of fitness. The seller impliedly warrants that the automobile is reasonably fit for and adapted to the purposes for which it is purchased, *i.e.*, a vehicle that will carry a driver and passengers with reasonable safety and efficiency and comfort. The parties may agree to do more or to do less, but unless there is proof of explicit departure from this norm, the presumption is that the dealer intended to deliver and the buyer intended to receive a reasonably safe, efficient and comfortable brand new car.

These principles do not, we think, represent a drastic departure from but rather an adaptation of the prevailing trends in the law of torts to the law of contracts. In *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969), this court adopted the rule of strict liability against the manufacturer—not the dealer—in accordance with the modern views declared in Restatement (Second) of Torts § 402 A (1965); Annot., 13 A.L.R.3d 1057, 1096. See W. Prosser, *The Fall of the Citadel*, 50 Minn. L. Rev. 791 (1966). Strict liability—liability without proof of negligence—in torts has been applied to the retail dealer despite disclaimers of warranty with greater and impressive frequency. *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960); *Appleman v. Fabert Motors, Inc.*, 30 Ill. App. 2d 424, 174 N.E.2d 892 (1961); *Vandermark v. Ford Motor Co.*, 61 Cal. 2d 256, 391 P.2d 168 (1964); *Clary v. Fifth Ave. Chrysler Center, Inc.*, 454 P.2d 244 (Alaska 1969); *Walsh v. Ford Motor Co.*, 59 Misc. 2d 241, 298 N.Y.S.2d 538 (1969); *Schenfeld v. Norton Co.*, 391 F.2d 420 (10th Cir., 1968).

That the rule of strict liability of the manufacturer for reasonable fitness of a brand new article originating as it did in torts should be adapted in contract law to the retail dealer is evident in *House v. Thornton*, 76 Wn.2d 428, 457 P.2d 199 (1969), a case involving the sale of a new house to

*its* first purchaser-occupant. In holding that the house was presumed by both seller and buyer to be reasonably fit for occupancy as a dwelling house by the buyer and his family, this court, we think, did no more than apply a rule of common sense to the kind of transaction that recurs perhaps more than a million times annually in the country—the purchase of a brand new house. Accordingly, when the foundation and substructure of the house proved to be so defective and inadequate that it could not be occupied by its first purchaser with reasonable safety and comfort, we imposed a rule of strict liability holding the builder-seller to the principle that he was under a duty to supply a structure adequate in foundation and supporting terrain to be used by the buyer for the purposes for which the house and lot had been sold.

This same rationale should be applied to the purchase of a brand new automobile. We are, therefore, of the opinion that, in the sale by a dealer or retailer of a brand new automobile, the dealer impliedly warrants that the automobile is of merchantable quality and that the new car is fit to transport the driver and his passengers with reasonable safety, efficiency and comfort—according to the size, model and power of the vehicle. Waivers of such warranties, being disfavored in law, are ineffectual unless explicitly negotiated between buyer and seller and set forth with particularity showing the particular qualities and characteristics of fitness which are being waived.

Reversed and remanded to the trial court to try the issue of damages, *i.e.*, to ascertain and grant the plaintiff judgment for the difference between the price paid and its fair market value in its delivered condition.

HAMILTON, C.J., FINLEY, ROSELLINI, and HUNTER, JJ., concur.

NEILL, J. (concurring)—I concur in the result but have not signed the majority opinion as I believe it is inappropriate to commingle considerations regarding the application of the parol evidence rule to implied warranties of

contract with considerations pertaining to the strict tort liability of a manufacturer. Further, the conclusion that waivers are ineffectual "unless explicitly negotiated between buyer and seller and set forth with particularity showing the particular qualities and characteristics of fitness which are being waived" is too restrictive. A rule which requires proof by a preponderance of the evidence that the purchaser was specifically made aware that he was waiving warranties is sufficient to protect the buyer from surprise without unduly restricting freedom of contract. This also comports with the current statutory law of sales. RCW 62A.2-202; RCW 62A.2-316. *See* Broude, *The Consumer and the Parol Evidence Rule: Section 2-202 of the Uniform Commercial Code,* 5 Duke L.J. 881 (1970).

STAFFORD and McGOVERN, JJ., concur with NEILL, J.

Petition for rehearing denied June 4, 1971.