William NELSON, et al., Appellants,

v.

WILKINS DODGE, INC., defendant and third-party plaintiff, Respondent,

v.

TOYOTA MOTOR SALES U. S. A., INC., et al., third-party defendants, Respondents.

No. 46343.

Supreme Court of Minnesota.

June 17, 1977.

Curtin, Emerick & Mahoney, and Richard A. Emerick, Minneapolis, for appellants.

Meier, Kennedy & Quinn and Gordon W. Shumaker, St. Paul, for Wilkins Dodge.

Heard before ROGOSHESKE, PETERSON, and TODD, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Plaintiffs appeal from a judgment for defendants, entered in Ramsey County Municipal Court, on defendant's motion for directed verdict. We affirm in part and reverse in part.

The elemental facts are not in dispute. On August 16, 1972, plaintiffs, William and Cheryl Nelson, bought a new 1972 Toyota

Hilux 4-cylinder half-ton pickup truck from Wilkins Dodge, Inc. (Wilkins), a Toyota dealer in St. Paul. Before making this purchase, Mr. Nelson, concerned about the size of a 4-cylinder engine, told a salesman at Wilkins that he needed a vehicle that could withstand constant freeway speeds. Plaintiff needed a sturdy vehicle because as an ironworker he was required to travel long distances to and from various jobs. The salesman replied that the pickup was fine for freeway driving and that it could be driven at 65 miles per hour all the time.

After purchasing the pickup, plaintiffs experienced numerous difficulties with it in its use as the family car. The difficulties included the following:

(1) Within a month of purchase and within its first 2,000 miles of use, bubbles appeared in the paint covering the seam on the back part of the pickup.

(2) Within the same period of time, the taillights failed to function. Mr. Nelson noticed that the taillight covers had been installed upside down, enabling rain to enter the assembly and short out the lights. He inverted the covers himself and experienced no problem with the lights thereafter.

(3) In the middle of October 1972, with approximately 7,500 miles on the pickup, as Mr. Nelson was driving through Wisconsin during a rainstorm the windshield-wiper blade and arm flew off into the night, forcing him to negotiate the last 100 miles of his journey at a slow speed keeping watch from the side window. The next day he discovered that the bolts from the windshield-wiper motor were loose and tightened them; he later had a new wiper blade and arm installed.

(4) In February 1973, with approximately 12,000 miles on the pickup, Mr. Nelson noticed oil leakage from the front and rear of the pickup. Because he was about to undertake an extensive trip, he took the vehicle to Larson Motors in Marquette, Michigan, where he then resided, for a tuneup.

(5) In March of 1973, during plaintiffs' trip, the horn bracket broke causing the horn to fall out, and the shift lever became loose preventing engagement of the transmission.

(6) In May 1973, during a trip from Texas to Minnesota, Mr. Nelson suspected that the pickup was leaking antifreeze. He took it to a Toyota dealer in Duluth, who flushed the system and found no leaks. Plaintiff experienced no further problem in this regard.

The principal complaint of plaintiffs, however, concerned engine difficulties—a loss of power and poor gas mileage—which plaintiffs attribute to defective valves. The story of the engine in question is long and circuitous, occasioned in part by Mr. Nelson following his seasonal work as an ironworker around the country and clouded by the fact that several Toyota dealerships worked on the engine.

The pickup was first serviced without charge by Wilkins in standard 3,000-mile and 6,000-mile checkups. In the middle of October 1972, plaintiffs moved to Michigan, at which time they noticed a gradual loss of power in the engine. Mr. Nelson took the pickup to Larson Motors in Marquette, Michigan, for a tuneup in December 1972, with about 9,000 miles on the vehicle. The engine head was cracked, requiring the valves to be replaced. The pickup then ran well. As a followup to the December repairs, plaintiffs returned the pickup 1,000 miles later in early January 1973, to have the head retorqued.

Plaintiffs then ventured to a warmer climate partly on vacation and partly in search of a job. They proceeded through Florida and finally arrived in Corpus Christi, Texas, where they decided to reside. In March, feeling that it was time for another tuneup with about 17,000 miles on the pickup, plaintiffs engaged George Young Toyota (George Young) in Corpus Christi for a complete tuneup. After the tuneup, Mr. Nelson noticed that the engine idled roughly and made excessive noise and that the valves clattered. In April, with another 1,000 miles on the pickup he returned it to George Young for further repairs. On the second visit to George Young, Mr. Nelson

watched the work being done because he "had a vague feeling that they hadn't done a very good tuneup the thousand miles prior." The pickup performed well after all the rocker arms were replaced. In May, about 1,000 to 1,500 miles later, in preparation for a vacation trip to Minnesota, plaintiffs again took the pickup to George Young for a tuneup. The engine was running a little roughly so the timing was adjusted.

In June, as plaintiffs were preparing to return to Texas from Minnesota, the pickup again gradually began to lose power. Plaintiffs returned to the Twin Cities and took the pickup, which had 23,000 miles on it, to Wilkins. The service manager informed Mr. Nelson that a cylinder had been damaged because of a burnt valve but that Wilkins did not have the parts to replace it and would not have them for 2 months. Because he needed the pickup, Mr. Nelson then took it to Southtown Toyota (Southtown) in Bloomington to see if they could repair it. After Southtown ground the valves and replaced the engine seats, the pickup again ran fairly well. Plaintiffs decided to resume their residency in Minneapolis. Mr. Nelson drove to Texas to terminate their residency there and on his return trip again noticed a gradual loss of power. Over the next 2 months the engine's condition worsened to the extent that by early September it barely provided plaintiffs with transportation. With 32,000 miles on the pickup, plaintiffs again took it to Wilkins, which found two valves were burned and said it would take several days to repair it. Because of a lack of new parts the repairs could not be completed for an additional 6 days, and Mr. Nelson was unable to go to the union hall for several days to see if ironwork was available. A thousand miles later Wilkins retorqued the engine's head and thereafter plaintiffs experienced no further difficulties with the pickup, which had been driven 77,000 miles at the time of trial.

1. Proximate cause must be established to set forth an action for breach of warranty. *Heil v. Standard Chemical Mfg. Co.*, 301 Minn. 315,

Plaintiffs sued Wilkins for breach of implied warranties of merchantability and fitness for a particular purpose, seeking recovery of their purchase price, expenses in purchasing and repairing the pickup, and lost wages. Wilkins impleaded Toyota Motor Sales, U. S. A., Inc. (importer), and Mid-Southern Toyota Distributors, Inc. (wholesaler), as third-party defendants. At the close of all the evidence, the trial court granted Wilkins' motion for a directed verdict. The propriety of that ruling is the issue raised by this appeal.

■ The trial court evidently grounded its decision on plaintiffs' failure to establish a sufficient causal relationship between the alleged breach of warranties and the losses they sustained. A directed verdict is appropriate only when the evidence, taken in the light most favorable to the opponent of the motion, would mandate that the trial court set aside a contrary verdict as being manifestly against the weight of the evidence. Rule 50.01, Rules of Civil Procedure for Municipal Courts; *E. H. Renner & Sons, Inc. v. Primus*, 295 Minn. 240, 203 N.W.2d 832 (1973). Since the correctness of the court's ruling is not contested as a matter of warranty law,[1] the instant issue is reduced to the satisfaction of plaintiffs' burden of proof, Minn.St. 336.2—607(4), by the evidence adduced.

■ Defendant asserts that the evidence supported inconsistent inferences as to the causes of the condition of the pickup. If the state of the evidence was such that the jury would have had to speculate among possible causes of the pickup's condition, then plaintiffs would have failed to sustain their burden of production, and the court's ruling would be correct. In *Heil v. Standard Chemical Mfg. Co.*, 301 Minn. 315, 324, 223 N.W.2d 37, 42 (1974), we quoted approvingly the following language from *Chisholm v. J. B. Simplot Co.*, 94 Idaho 628, 631, 495 P.2d 1113, 1116 (1972):

223 N.W.2d 37 (1974); 21A M.S.A., § 336.2—314, U.C.C. Comment 13.

" ' * * * Where the record shows that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of the latter, the plaintiff may not recover, since he has failed to prove that the defendant's breach caused the injury.' " Accord, *E. H. Renner & Sons, Inc. v. Primus, supra; Village of Plummer v. Anchor Casualty Co.*, 240 Minn. 355, 61 N.W.2d 225 (1953).

The defects alleged by plaintiffs warrant individual consideration. The warranties that plaintiffs endeavored to prove defendant breached involved (1) whether the pickup was "fit for the ordinary purposes for which such goods are used", Minn.St. 336.2–314(2)(c) and (2) whether the pickup was fit to be driven at sustained high rates of speed, about which plaintiffs consulted Wilkins, Minn.St. 336.2–315, (fitness for a particular purpose).[2]

█ Plaintiffs assert that there can be no question that proximate cause has been demonstrated with respect to the paint bubbles, the inverted taillight covers, and the loosened windshield-wiper blade and arm and shift lever. Defendant suggests that the paint bubbles and the loosened windshield wiper, horn bracket, and shift lever just as probably resulted from the continuous and hard use to which plaintiffs put the pickup as from any defect inhering in the vehicle when plaintiffs purchased it. Although liability for breach of warranty attaches only when a defect existing in the goods causes a breakdown in quality, e. g.,

*Tennessee-Carolina Transp. Inc. v. Strick Corp.*, 286 N.C. 235, 210 S.E.2d 181 (1974), generally no specific defect need be alleged, and a defective condition can be proved by circumstantial evidence. See, *Rose v. Epley Motor Sales*, 288 N.C. 53, 215 S.E.2d 573 (1975); *McCarthy v. Florida Ladder Co.*, 295 So.2d 707 (Fla.App.1974). No direct evidence was introduced as to the causes of the conditions in question. It is reasonable to suppose, however, that vehicles that are fit for ordinary purposes [3] probably do not display these defects this early, even if they are driven a great deal within a short period of time. Thus, the causes of the faulty paint, windshield wiper, horn bracket, and shift lever were questions that should have been decided by the jury. A fortiori, the cause of the inverted taillight covers was a jury question.

Plaintiffs have also cited antifreeze and oil leaks as being further defects of the pickup. Defendant correctly asserts that there was no probative evidence of an antifreeze leak and thus there could be no breach in that respect. The question of the oil loss is less clear. Although defendant contends that the jury might reasonably have inferred that the oil leakage was caused by an earlier improper oil change, this contention is unavailing because the record does not indicate that anyone other than defendant performed an earlier oil change.[4] Therefore, the cause of the oil loss was also a question for the jury.

█ The prime controversy concerns the cause of the major difficulties plaintiffs

---

**2.** Defendant suggests that the warranty of fitness for a particular purpose is inapplicable in this case because sustained high-speed driving is an ordinary purpose for which an automobile is used. See, 21A M.S.A., § 336.2—314, U.C.C. Comment 2. The implied warranties of merchantability and fitness often overlap, however, 3 Williston, Sales (4 ed.) § 19–5, and though it is a close question, both should be applicable here. See, *Dougall v. Brown Bay Boat Works & Sales, Inc.*, 287 Minn. 290, 296, n. 3, 178 N.W.2d 217, 221 (1970); Minn.St. 336.2—317.

**3.** *Berg v. Stromme*, 79 Wash.2d 184, 195, 484 P.2d 380, 386 (1971) (applying the Uniform

Sales Act), states: " * * * [I]n the sale of a brand new automobile * * * [t]he seller impliedly warrants that the automobile is reasonably fit for and adapted to the purposes for which it is purchased, *i. e.*, a vehicle that will carry a driver and passengers with reasonable safety and efficiency and comfort."

**4.** Wilkins performed the 3,000–mile and 6,000–mile checkups, but no evidence indicates specifically what work was performed. Mr. Nelson testified that he changed the oil several times, but those incidents occurred after the oil loss in question.

encountered with the engine. Plaintiffs advanced testimony to establish that the valves of the 1972 Toyota Hilux were not designed to withstand the temperatures generated by an engine constricted by pollution control devices and were therefore defective and in breach of defendant's implied warranties. No evidence, however, linked this design defect to the difficulties plaintiffs experienced with their Toyota. Thus, this testimony is only indirect evidence of a defect. Defendant contends that to rely on it as evidence of causation would require speculation by the jury.

The initial valve work on the pickup was performed by Larson Motors at 9,000 miles after 4 months' use. Relying on the testimony of plaintiffs' expert that there is no specific time at which cars normally require valve work and that the necessity for valve work is governed by use and maintenance of the vehicle, defendant asserts that the jury could reasonably have concluded that this incidence of valve trouble was part of the normal deterioration of the vehicle and not the result of defectively designed valves. We think, however, that the low mileage on the vehicle at which this trouble first appeared and the testimony as to a design defect in 1972 Toyota Hiluxes sufficed to remove the inference of causation from the realm of speculation. Indeed, most of the repairs by Larson Motors were covered by an express warranty, suggesting that Toyota itself acknowledged that such trouble may stem from a defect. Plaintiffs merely have to introduce sufficient evidence to support a verdict in their favor and the evidence is in that respect sufficient.

█ Attributing the necessity for later engine work to an inherent design defect is more difficult because increased mileage or faulty repairs also may have operated as causal factors. Plaintiffs' initial visit to George Young was for a tuneup. When Mr. Nelson returned 1,000 miles later to have the rocker arms replaced he suspected the earlier repairs had not been properly performed, permitting an inference that the earlier repairs had been faulty and had caused the later difficulty. Moreover, the head of the engine was not retorqued after Southtown ground the valves. Mr. Nelson did not recall whether Southtown told him he must return for this procedure, but he considered the possibility that it was necessary. Plaintiffs' expert admitted on cross-examination that there was a reasonable likelihood that further valve problems would result if this procedure was not followed. Thus, plaintiffs' failure to return the pickup for adjustments after the valve work at Southtown may have necessitated the later valve repairs done by Wilkins.

A case providing support for defendant's position is *Kriedler v. Pontiac Div. of General Motors Corp.*, 514 S.W.2d 174 (Tex.Civ. App.1974). In that case, 11 months after the plaintiff had purchased the car and after it had been driven 17,000 miles, the engine caught on fire. Six months before this incident the timing points and spark plugs on the car had been replaced by servicemen independent of the defendant manufacturer and dealer. The president of the dealership testified that the damage to the engine was caused by improperly adjusted timing and that installation of points and plugs without a timing adjustment as Pontiac recommended would have caused the mishap. In affirming a directed verdict for defendants at the close of the evidence, the court stated:

"In the absence of proof that the implied warranty is of a continuing nature, such as for a fixed period of time, such warranty relates to the time of sale and does not cover future defects not in existence at such time or inherent in the article sold. * * *

"The evidence, given the construction most favorable to Kriedler's case, is not sufficient to negate the possibility of an intermediate act or agency (that is, an act or cause arising after [delivery] and before the engine fire), producing the engine failure. Neither is the evidence sufficient to negate access to and possible misrepair or maltreatment of the engine by others." 514 S.W.2d 176.

In the instant case, all service appears to have been rendered by Toyota dealers, and nothing appears to have been done in contravention of the manufacturer's recommendations. Nevertheless, the principle embodied in the *Kriedler* case is sound and is applicable here.

The evidence that faulty repairs and increased mileage on the vehicle at the time the later repairs were made may have contributed to plaintiffs' difficulties reduces the probative value that attaches to the circumstantial weight of the appearance of the difficulty and of the testimony as to a design defect. In such circumstances, plaintiffs' theory of causation is only one among several equally likely possibilities, and plaintiffs thus have not satisfied their burden of proof with respect to the repairs made by George Young and Wilkins. The difficulties repaired at Southtown are not so directly attributable to causes other than a defect; however, the earlier repairs, especially the valve work at Larson Motors, and the advanced mileage on the pickup render it only speculation to assert that the Southtown valve repair was necessitated by a defect in the vehicle without additional proof of a defect or elimination of other possible causes of the pickup's condition.

The trial court's direction of a verdict for defendant was correct with respect to the valve work performed after the repairs at Larson Motors. Yet with respect to the paint bubbles, the taillight covers, the windshield wiper and arm, the oil loss, the horn bracket, the shift lever, and the initial valve repairs at Larson Motors, plaintiffs carried their burden of production as to causation. Since plaintiffs otherwise made out a prima facie case of breach of warranty, a new trial is mandated on these alleged defects.

Affirmed in part; reversed in part; and remanded for a new trial.