[No. 49545–9.   En Banc.   June 14, 1984.]

DIANE F. PERRY, *Appellant,* v. ISLAND SAVINGS AND LOAN ASSOCIATION, *Respondent.*

*Thomas J. Majhan,* for appellant.

*Edward C. Beeksma* and *Zylstra, Beeksma & Waller,* for respondent.

*William L. Dwyer, Peter M. Vial, Julianne Splain,* and *Jon A. Iverson,* amici curiae for appellant.

*John H. Strasburger, Lynn M. Skordal,* and *Janet Gray* on behalf of Capital Savings Bank and *Robert B. Leslie* and *Alan K. Willert* on behalf of Olympic Savings and Loan Association, amici curiae for respondent.

DORE, J.—We hold that a deed of trust due–on–sale provision being foreclosed by a state savings and loan association is not enforceable. We set aside Island Savings and Loan Association's summary judgment on foreclosure and remand to the trial court for entry of judgment for Perry in accordance with the provisions of this decision.

### FACTS

On November 17, 1977, the Perrys granted Island Savings and Loan Association (Island) a deed of trust in their residence to secure a $22,100 loan, which deed contained the following language:

> If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, . . . Lender may, at Lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Deed of Trust shall be at such rate as Lender shall request.

Clerk's Papers, at 16–17.

Four years later, on August 7, 1981, Perry sold the residence to James Tolpin and Diane C. Mayers without securing the permission of Island; nor was any agreement reached with Island and the new buyers on an increased interest rate. Island retaliated by initiating nonjudicial foreclosure proceedings.

Perry brought this action for declaratory judgment alleging that the due–on–sale clause was an unreasonable restraint on alienation and void, and that Island's actions were in violation of the consumer protection law. Island denied both allegations. Island further claimed that the property was being damaged by the new owners, jeopardizing the bank's security.

Perry subsequently moved for summary judgment. In support of her motion, she submitted two appraisals of the

subject property, one of $60,000 and the other for $58,195.

The trial court entered judgment for Island, authorizing foreclosure.

In arriving at its decision, the court concluded that the due–on–sale clause in the deed of trust was enforceable even though the security was not impaired. The court reasoned that the State Legislature, acting pursuant to the Garn–St Germain Depository Institutions Act of 1982 (Garn Act), 12 U.S.C. § 1701j–3, had sanctioned such clauses by enacting the state savings and loan "parity" statute, RCW 33.12.012.

Perry, on appeal here, contends that neither the state "parity" statute nor the Garn Act altered the rule of *Bellingham First Fed. Sav. & Loan Ass'n v. Garrison,* 87 Wn.2d 437, 553 P.2d 1090 (1976), which governs enforceability of due–on–sale clauses. She also argues that Island's attempts to enforce the due–on–sale clause violated the consumer protection law.

In an effort to hold its judgment, Island contends that the clause in this action is not a due–on–sale clause and, hence, not governed by the rule of *Bellingham.* Island also contends that the Garn Act preempted state restrictions on the enforceability of due–on–sale clauses in Washington, and that the "parity" statute gave state savings and loans the authority to enforce due–on–sale clauses in the same manner as federal savings and loans, essentially overruling *Bellingham.* Island further asserts that it would be a denial of equal protection to deny state savings and loans the authority to enforce due–on–sale clauses, as similar federal institutions are given such power.

## HISTORY

The issues in this action arise out of numerous attempts by state and federal courts, the Legislature, and Congress to regulate the enforcement of due–on–sale clauses.

The initial cases interpreting due–on–sale clauses occurred in 1976 when this court rendered opinions in *Miller v. Pacific First Fed. Sav. & Loan Ass'n,* 86 Wn.2d

401, 545 P.2d 546 (1976) and *Bellingham First Fed. Sav. & Loan Ass'n v. Garrison, supra.* In *Miller,* the borrowers had signed a note and real estate mortgage which contained the following provision:

> If title to said property shall pass from me by deed or otherwise, . . . then such change in title or occupancy shall be deemed to increase the risk of lender, and lender or other holder may declare the entire balance immediately due and payable, *or at its sole option it may consent to said change in title or occupancy and may increase the interest rate of said loan not to exceed two per cent per annum . . .*

*Miller,* at 402. The borrowers conveyed the property, and the bank sought to enforce the provision by increasing the interest rate one–half of 1 percent. This court held that the interest–rate–increase clause was not an unreasonable restraint on alienation except where its operation would be inequitable under the circumstances. *Miller,* at 406.

In *Bellingham,* the borrowers signed two notes and mortgages that contained the following provision:

> The mortgagors further agree that they will not make any voluntary inter vivos transfer of the premises or any part thereof without first obtaining the written consent of the mortgagee. Any such transfer, if the mortgagee shall not so consent, shall constitute a default under the terms of this instrument . . .

*Bellingham,* at 438. The borrowers conveyed the property without the written consent of the bank. The bank then sued to foreclose the mortgage. This court distinguished this clause from the one in *Miller,* indicating that *Miller* concerned only that portion of the due–on–sale clause which permitted the lender to increase the mortgage interest, whereas the clause in *Bellingham* is an acceleration clause where, upon transfer, the monthly payments are accelerated and the entire loan becomes due. The court went on to hold that, absent a showing the enforcement of the due–on–sale clause is necessary to protect the lender's security, such a clause is an unreasonable restraint on alienation and, therefore, unenforceable. *Bellingham,* at

440–41.

On July 31, 1976, a few days before *Bellingham* was decided, federal regulations were enacted which allowed *federally chartered* institutions to enforce due–on–sale clauses.[1] The regulation, now 12 C.F.R. § 545.8–3(f) (1983), provides in relevant part at page 189:

> [A federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as [otherwise] provided in . . . this section . . . exercise by the association of such option (hereafter called a due–on–sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract.

In June 1982, the United States Supreme Court held the federal regulations which empower federal institutions to enforce due–on–sale clauses preempted conflicting state law. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982). The state law, held to be preempted in *de la Cuesta,* was a California common law rule indistinguishable from the rule adopted by this court in *Bellingham.* Additionally, the due–on–sale clause at issue in *de la Cuesta* is indistinguishable from the clause in the instant action.

The effect of *de la Cuesta* in Washington was that federal savings and loan associations could enforce due–on–sale clauses in accordance with the federal regulations, but

---

[1]Even before adopting the due–on–sale regulation, the Federal Home Loan Bank Board had interpreted 12 C.F.R. § 545.8–3(a) (1982), a regulation promulgated in 1948, as authorizing federal savings and loans to exercise due–on–sale provisions, despite any state law to the contrary. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 147 n.4, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982).

state–chartered lenders could not.[2]

In the interim between the enactment of the federal regulations and *de la Cuesta,* the Washington Legislature passed the savings and loan "parity" statute:

> Notwithstanding any other provision of law, a savings and loan association may exercise any of the powers conferred as of May 8, 1981, upon a federal savings and loan association doing business in this state.

RCW 33.12.012. In 1982, the statute was amended to read:

> Notwithstanding any other provision of law, in addition to all powers, express or implied, that an association has under this title, an association may exercise any of the powers conferred as of February 25, 1982, upon a federal savings and loan association doing business in this state.

The final piece of legislation impacting due–on–sale clauses is the Garn Act.[3] The purpose of the Garn Act is

---

[2]The actual holding in *Bellingham First Fed. Sav. & Loan Ass'n v. Garrison,* 87 Wn.2d 437, 553 P.2d 1090 (1976) no longer retains validity as it involved a federal savings and loan institution. However, the law enunciated in *Bellingham* when applied to nonfederally chartered institutions is valid.

[3]The pertinent provisions of the Garn–St Germain Depository Institutions Act of 1982, 12 U.S.C. § 1701j–3, provide at pages 841–42:

"[b](1) Notwithstanding any provision of the constitution or laws (including the judicial decisions) of any State to the contrary, a lender may, subject to subsection (c) of this section, enter into or enforce a contract containing a due–on–sale clause with respect to a real property loan.

". . .

"[c](1) In the case of a contract involving a real property loan which was made or assumed, including a transfer of the liened property subject to the real property loan, during the period beginning on the date a State adopted a constitutional provision or statute prohibiting the exercise of due–on–sale clauses, or the date on which the highest court of such State has rendered a decision (or if the highest court has not so decided, the date on which the next highest appellate court has rendered a decision resulting in a final judgment if such decision applies State–wide) prohibiting such exercise, and ending on October 15, 1982, the provisions of subsection (b) of this section shall apply only in the case of a transfer which occurs on or after the expiration of 3 years after October 15, 1982, except that—

"(A) a State, by a State law enacted by the State legislature prior to the close of such 3-year period, with respect to real property loans originated in the State by lenders other than national banks, Federal savings and loan associations, Federal savings banks, and Federal credit unions, may otherwise reg-

simply to make all due–on–sale clauses enforceable in accordance with their terms regardless of any contrary state law. 12 U.S.C. § 1701j–3(b)(1). Though Congress intended to preempt state efforts to regulate the enforcement of due–on–sale provisions in real estate loans, a total federal preemption would have had an unfair impact on those home buyers who, despite the contractual terms of their mortgage contracts, relied on state due–on–sale restrictions and believed they had assumable loans. Accordingly, the legislation created a 3–year grace period, beginning October 15, 1982 and ending October 15, 1985, in which "window period" loans originated by nonfederally chartered lenders are subject to applicable state law. 12 U.S.C. § 1701j–3(c)(1)(B).[4] In general, such "window period" loans exist only where they originated after a state law determination that due–on–sale clauses are unenforceable or where the property subject to these loans was transferred during the period following such a state law change but prior to the date of the enactment of the federal legislation. The loans which fall into this category are termed "window period"

---

ulate such contracts, in which case subsection (b) of this section shall apply only if such State law so provides; . . .

"(2)(A) For any contract to which subsection (b) of this section does not apply pursuant to this subsection, a lender may require any successor or transferee of the borrower to meet customary credit standards applied to loans secured by similar property, and the lender may declare the loan due and payable pursuant to the terms of the contract upon transfer to any successor or transferee of the borrower who fails to meet such customary credit standards.

"(B) A lender may not exercise its option pursuant to a due–on–sale clause in the case of a transfer of a real property loan which is subject to this subsection where the transfer occurred prior to October 15, 1982.

"(C) This subsection does not apply to a loan which was originated by a Federal savings and loan association or Federal savings bank."

[4]The statute was structured so as to minimize its retroactive effect and to allow, in an area of contract law which quite clearly had been subject to state if not federal regulation previously, for a gradual working out of problems for persons who previously thought they had assumable loans. *See* Senate Comm. on Banking, Housing & Urban Affairs on S. 2879, Report on Depository Institutions Amendments of 1982, Fed. Banking L. Rep. No. 937, at 22 (Sept. 17, 1982) (Banking L. Rep.).

loans because they fall into the "window" between the time of state law restrictions on enforcement and the time that the Garn Act closed the "window" by making all due–on–sale clauses enforceable. 12 U.S.C. § 1701j–3(c)(1). For a "window period" loan to exist, there must be a state court decision or constitutional or statutory provision prohibiting the exercise of the due–on–sale clause, and the date of such prohibition must be ascertained. If the loan originated prior to the date of the change in state law, it will not be a "window period" loan unless the property encumbered by the loan was transferred with an assumption of the loan or subject to the loan during a period following the date of such change in state law but prior to October 15, 1982. Thus, the history of transfer of the property must be considered before it can be determined whether a loan falls into the "window period" loan category. In addition, the lender must be of the type to which the prohibition of due–on–sale clauses applies. The 3–year grace period does not extend to any loan which was originated by a federal savings and loan association or federal savings bank. Under the Garn Act, a due–on–sale clause in a "window period" loan is only unenforceable for the 3–year period following the effective date of the act.[5]

---

[5]These basic requirements may be further complicated by state regulations because the Garn Act permits a state to adopt regulations relative to "window period" loans. The 3–year grace period, October 15, 1982 to October 15, 1985, provides state legislatures, in those states with "window periods", with the opportunity to review the impact due–on–sale restrictions have imposed on nonfederally chartered lenders, consider the rights of consumers who received assumable mortgages under state laws or court decisions restricting due–on–sale enforcement, and to formulate an alternative approach to "window period" loans. For example, to the extent of its authority to so act under state law, a state might repeal an existing due–on–sale restriction. A state might also lengthen the time that state due–on–sale restrictions would apply to "window period" loans, or authorize blended rates for these loans. State legislatures may not, however, expand the types of loans to which the "window period" applies. If a state takes no action during the 3–year grace period, federal law will preempt the field and due–on–sale clauses in "window period" loans will be enforceable. 12 U.S.C. § 1701j–3(c)(1)(A); Banking L. Rep. at 23.

### WASHINGTON IS A WINDOW PERIOD STATE

■ It was argued that there is no "window period" in Washington because *Bellingham* did not, under 12 U.S.C. § 1701j–3(c)(1), "prohibit the exercise of due–on–sale clauses", and allowed limited enforceability of such clauses where the lender demonstrates that his security will be impaired. This argument is without merit. No state or federal court has declared an absolute prohibition on due–on–sale clauses. Jennings & McGuire, *Due–on–Sale Clauses: What's Due? Plenty!,* 11 Real Est. L.J. 291–92 (1983). The wording of the Garn Act cannot logically be construed to mean that the state court decision must have prohibited the enforcement of due–on–sale clauses in all cases. Additionally, the Comptroller of the Currency has added Washington to the list of states which qualify as "window period" states, based upon the *Bellingham* decision. The "window period" begins August 19, 1976 and ends October 15, 1982. 48 Fed. Reg. 31, 233–34 (1983); *see also* Geier, *Due–on–Sale Clauses Under the Garn–St. Germain Depository Institutions Act of 1982,* 17 U.S.F. L. Rev. 355, 375 n.71 (1983).

We hold that Washington is a "window period" state. *Bellingham* marks the beginning of the Washington "window period" and it closes on the date of enactment of the Garn Act, October 15, 1982. Any loan originating *prior* to *Bellingham,* August 19, 1976, and transferred prior to October 15, 1982, is governed by the *Bellingham* restrictions on enforcement of due–on–sale clauses. Any loan originating subsequent to *Bellingham* and prior to October 15, 1982 is subject to the *Bellingham* rules for the 3–year grace period which ends on October 15, 1985. After such date, due–on–sale clauses are fully enforceable. Any loan executed after October 15, 1982 is subject to federal preemption and the due–on–sale clauses are fully enforceable according to their terms. *See Magney v. Lincoln Mut. Sav. Bank,* 34 Wn. App. 45, 56 n.5, 659 P.2d 537, *review denied,* 99 Wn.2d 1023 (1983).

Application of the governing rules provides that the

instant loan would be considered a "window period" loan (executed after *Bellingham* and prior to October 15, 1982), and the restrictions of *Bellingham* are applicable because the loan was transferred prior to the termination of the grace period, October 15, 1985.

### DUE–ON–SALE PROVISION NOT AN INTEREST RATE INCREASE CLAUSE

Island argues that the clause in the subject case does not qualify as a due–on–sale but rather is an interest–rate–increase clause. Island points to the settlement negotiations detailed in the affidavits to demonstrate that Island attempted to reach an agreement to a rate increase. We are not persuaded. Although the clause in this case incorporates rate increase language similar to the clause in the *Miller* case, the clause itself specifies that until an agreement to a rate increase is reached, the lender has the option to accelerate the full amount due. This provision, unlike the one in *Miller,* contemplates a mutual agreement to a rate increase. Where such an agreement cannot be reached, the bank may unilaterally accelerate the loan. Thus, this clause is analogous to the provision construed as a due–on–sale clause in *Bellingham,* and will hereafter be treated as a due–on–sale clause. *See Magney,* at 53.

### PARITY STATUTE NOT APPLICABLE

Respondent argues that the "parity" statute either closed the "window period" on the date of its enactment, May 8, 1981, or eliminated the window period altogether by effectively overruling *Bellingham.*

The first "parity" statute granted state savings and loans all the powers conferred upon a federal savings and loan doing business in this state as of May 8, 1981. The subsequent reenactment gave savings and loans all powers conferred upon federal savings and loans doing business in this state as of February 25, 1982.[6] The trial court found that

---

[6]The provisions of the initial "parity" statute carried forward and reenacted in substance in the second "parity" statute should be construed as a law continu-

because federal savings and loans were granted authority in 1976 to enforce due–on–sale provisions, the Legislature granted state–chartered savings and loans corresponding authority in the 1981 "parity" statute.

■ The basic goal of all statutory construction is to carry out the intent of the Legislature. *Gross v. Lynnwood,* 90 Wn.2d 395, 583 P.2d 1197, 96 A.L.R.3d 187 (1978). We must, therefore, examine what powers were conferred as of May 8, 1981 and February 25, 1982 upon a federal savings and loan doing business in this state.

■ Despite the prior enactment of the federal regulations giving federal institutions the authority to enforce due–on–sale provisions, this court in *Bellingham* held that a federal savings and loan did not have unrestricted authority to enforce such provisions. When the Legislature enacted the "parity" statutes, *Bellingham* was still considered the law in Washington. It was not until June 28, 1982, when the United States Supreme Court held in *de la Cuesta* that 12 C.F.R. § 545.8–3(f) (1982) preempted contrary state law, that an unrestricted right to enforce due–on–sale clauses was established for federal savings and loans doing business in Washington.[7]

Since *de la Cuesta* was not decided until after the Washington Legislature had acted, it is apparent that *Bellingham* conferred only a limited right of due–on–sale enforcement to federal savings and loans at the date of enactment of the "parity" statutes.

An examination of the savings and loan association legislation as a whole indicates that the purpose of the revisions and amendments to the savings and loan statutes was to

---

ing from the first enactment. *See Kuehl v. Edmonds,* 91 Wash. 195, 157 P. 850 (1916).

[7]Before the *de la Cuesta* decision, the reported precedent from other jurisdictions was in conflict over the question of whether federal savings and loan associations could *validly* enforce due–on–sale clauses without regard to the laws of the states in which they operated. *See, e.g., Holiday Acres 3 v. Midwest Fed. Sav. & Loan Ass'n,* 308 N.W.2d 471 (Minn. 1981), which held that the federal regulations could *not* validly preempt state laws.

modernize outdated statutes relating to organization, management and investment powers of state savings and loans. *See* RCW 33.04.002. When viewed in conjunction with the entire savings and loan legislation, the purpose of the "parity" provision was to avoid the wholesale statutory review, repeals, and revisions which would otherwise have been required to alleviate conflicts between state provisions concerning investment restrictions, reserve requirements, and the like, and the then recently enacted federal Depository Institutions Deregulation and Monetary Control Act of 1980. The federal act, among other things, broadened the scope of permissible investments by federal lenders, loosened reserve regulations, and allowed affiliation with service investment companies. State savings and loan associations were, by various Washington statutes, barred from taking advantage of some of the new opportunities which the federal deregulation act allowed federal savings and loans. *See, e.g.,* RCW 33.24 (limiting the types of investments state savings and loans could make); RCW 33.12 (establishing available fund requirements for state savings and loans).

Legislative history of the 1982 "parity" statute strongly illustrates that the legislation did not intend to affect the Washington law governing enforcement of due–on–sale provisions.

POINT OF INQUIRY

Mr. Dawson yielded to question by Mr. Padden.

Mr. Padden: "Representative Dawson, I presume you are aware of court decisions which have held the due–on–sale clause is a restriction on the right of private property, and it's an undue alienation of that right. Does this bill, or does it not, legitimize the due–on–sale clause to savings and loan associations?"

Mr. Dawson: "Representative Padden, it's my opinion that whether or not we approve this amendment, it would not affect, in any depreciable way, the rights of the question of the due–on–sale clause."

House Journal, 47th Legislature (1982), at 432.

Testimony before the House Financial Institutions and Insurance Committee, with representatives from the sav-

ings and loan industry present, is strong evidence that the proposed savings and loan legislation did not affect due–on–sale enforcement. A representative appearing on behalf of the Washington Bankers' Association specifically testified that the Association preferred a single financial institutions code that would resolve the differences between all the various financial institutions as opposed to the separate considerations given to savings and loans. During his remarks, he indicated that the bill did not give the savings and loans some of the powers they desired. Specifically, the proposed legislation did not provide for the authority to enforce due–on–sale clauses.[8]

We hold that the savings and loan "parity" statutes did not alter the rule of *Bellingham* or in any manner affect the enforceability of due–on–sale provisions.

### No Violation of Equal Protection

■ It is contended that even if the due–on–sale clause in this deed is unenforceable during the "window" and grace period, it would be a denial of equal protection as to state savings and loans because federal institutions are allowed to enforce due–on–sale clauses under 12 C.F.R. § 545.8–3(f) (1982) and *de la Cuesta,* while state–chartered institutions cannot. We disagree. The federal district court for Utah recently considered a similar claim. *Utah League of Insured Sav. Ass'ns v. Utah,* 555 F. Supp. 664 (D. Utah 1983). The Utah State Legislature had passed a law prohibiting state–chartered savings and loan associations from enforcing due–on–sale clauses originated either before or after May 12, 1981, except where such a clause was necessary to protect the lender's security. The state–chartered lenders sued the state, alleging, among other things, that they were being denied equal protection because federally chartered lenders could enforce such clauses under *de la Cuesta.* The court stated that the state law violated equal

---

[8]Tape C, House Financial Institutions and Insurance Committee, January 21, 1982.

protection only if it lacked a rational basis for treating state and federal lenders differently. The court then reasoned:

Where the federal savings and loan associations are governed by federal laws which support federal objectives, and the state savings and loan associations are governed by state laws which are enacted to further state purposes, this court is unable to conclude the resulting difference in treatment is a classification lacking in rational justification.

*Utah League,* at 670. The same analysis applies here. This state's policy of promoting the transferability of title to real property provides a rational basis for distinguishing between federally and state–chartered lenders. Here Island was not denied equal protection of the law.

### NO NEED TO OVERRULE *BELLINGHAM*

Island's final contention is that *Bellingham* should be overruled. To support this argument, Island notes that (1) sharp fluctuations in interest rates and higher costs of money have resulted in many bank failures; (2) *de la Cuesta*'s approval of the 1976 federal due–on–sale regulation implicitly sanctions these clauses; (3) the "parity" statute indicates a legislative approval; and (4) the marked trend in a majority of states is to uphold enforcement of due–on–sale clauses. *See Magney v. Lincoln Mut. Sav. Bank, supra* at 58–63 (Green, J., concurring; McInturff, J., dissenting).

Although these arguments have some merit, we prefer the orderly transition to enforceability provided by the Garn Act. Congress has provided for the gradual preemption of state law regarding due–on–sale clauses designed to honor the reasonable expectations of homeowners with existing mortgages and deeds of trust containing such clauses. In Washington, homeowners have reasonably believed that due–on–sale clauses are unenforceable subsequent to the *Bellingham* decision. The procedures of the Garn Act protect these expectations. We decline to overrule *Bellingham.*

CONSUMER PROTECTION LAW

Perry contends that Island attempted to enforce the due–on–sale clause with full knowledge that the clause was unenforceable under *Bellingham*. Perry alleges that Island's conduct was unfair under the consumer protection law as construed in *Anhold v. Daniels,* 94 Wn.2d 40, 614 P.2d 184 (1980). *Anhold* held that for a person to bring an action under the consumer protection law, the conduct complained of must

(1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest.

*Anhold,* at 45. This court also set forth the following test for determining whether an action was contrary to the public interest:

We believe the presence of public interest is demonstrated when the proof establishes that (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

*Anhold,* at 46.

Application of the *Anhold* test depends on whether or not the due–on–sale clause was, in fact, unenforceable. As indicated by the foregoing discussion of the applicable law, resolution of this issue involved some complexity. The questions concerning application of the Garn Act and "parity" statute are of first impression in this court. Island's action in attempting to enforce the due–on–sale clause was done in good faith under an arguable interpretation of existing law. Such conduct in a single case attempting to determine the legal rights and responsibilities of both parties should not be considered "unfair" in the context of the consumer protection law. We hold acts or practices performed in good faith under an arguable interpretation of existing law do not constitute unfair conduct violative of the consumer protection law. Island simply attempted to

enforce what arguably was a valid and enforceable due–on–sale clause.[9]

## CONCLUSION

We hold that Washington is a "window period" state under the federal Garn Act. The "window period" commences from the date of *Bellingham,* August 19, 1976, and ends with the enactment of the Garn Act, October 15, 1982. All contracts entered into between August 19, 1976 and October 15, 1982 are "window period" loans and subject to the restrictions of *Bellingham* until October 15, 1985, when the Garn Act grace period terminates. For those contracts executed prior to *Bellingham,* the restrictions of *Bellingham* apply to transfers occurring prior to October 15, 1982. All contracts entered into after October 15, 1982 are subject to the Garn Act's mandate of enforceability on due–on–sale clauses.

The "parity" statutes did not affect *Bellingham* or the subject case and have no application to due–on–sale clauses.

There is no denial of equal protection where federal institutions are permitted to enforce due–on–sale clauses while at the same time state–chartered institutions lack such power.

There is no violation of the consumer protection law in Island's attempt to enforce the due–on–sale clause where it brought a single case under an arguable interpretation of existing law.

The Perry deed of trust was executed subsequent to

---

[9]Nor does the attempt to enforce the due–on–sale clause constitute a per se violation of the consumer protection law. In *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 649 P.2d 828 (1982), the court said:

The rule is this: unless there is a "specific legislative declaration" of a public interest, the public interest requirement of RCW 19.86.090 is not per se satisfied even though in engaging in an unfair or deceptive act or practice in the conduct of trade or commerce the defendant violates a statute.

(Citation omitted.) *Haner,* at 762. Our Legislature has not enacted a statute restricting enforcement of due–on–sale clauses. Therefore, any claim of a per se violation is unfounded. *See Magney v. Lincoln Mut. Sav. Bank,* 34 Wn. App. 45, 65–67, 659 P.2d 537, *review denied,* 99 Wn.2d 1023 (1983).

*Bellingham* and transferred prior to October 15, 1985. Accordingly, the Perry due–on–sale clause was unenforceable absent a showing of impairment of security. The trial judge found Island's security was not threatened. We agree.

We reverse and remand to the trial court for entry of a declaratory judgment for Perry in accordance with the provisions of this decision.

WILLIAMS, C.J., ROSELLINI, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., and DORAN and HAMILTON, JJ. Pro Tem., concur.