[No. 15027-5-III. Division Three. May 15, 1997.]

WILLIAM P. COX, ET AL., *Respondents*, v. LEWISTON GRAIN GROWERS, INC., *Appellant.*

358

*Joseph A. Wright* and *Randall, Blake & Cox (David R. Risley,* of counsel), for appellant.

*Michael R. Tabler* and *Schultheis & Tabler,* for respondents.

THOMPSON, J. — William and Terrilie Cox (Mr. Cox) purchased certified winter wheat seed from Lewiston Grain Growers (LGG). The fields where he planted the seed failed to produce a crop. Mr. Cox sued LGG claiming the seed was defective. After a bench trial, the court entered judgment in favor of Mr. Cox. LGG now appeals contending the court erred by: (1) applying Washington law to the transaction; (2) concluding the warranty disclaimer and limitation of remedies clause was unenforceable; (3) concluding an express warranty existed and was breached; (4) concluding several provisions of the Seed Act and the Consumer Protection Act (CPA) were violated; (5) failing to conclude LGG had an applicable defense to the CPA violations; and (6) holding insurance payments

Mr. Cox received were collateral source payments. We affirm.

William and Terrilie Cox own and operate a farming and ranch business on leased property in Garfield and Columbia counties. LGG is an Idaho corporation authorized to do business in Washington. LGG sells agricultural seeds to farmers. All of LGG's business operations are located in Idaho except for one in Pullman, Washington.

Kevin W. Whittaker, a former employee of Mr. Cox, worked for LGG in 1991. In the summer of 1991, Mr. Whittaker began contacting Mr. Cox and other Garfield county farmers about buying winter wheat seed from LGG. He initiated all the contacts. Mr. Cox agreed to buy Stephens variety certified winter wheat seed from LGG that year.

In 1991, LGG had several lots of certified Stephens variety winter wheat seed, including Lot No. 44A/3003 (Lot 3). LGG delivered a sample of untreated Lot 3 seed to the Idaho State Seed Laboratory for germination testing. The germination rate for the untreated seed from Lot 3 was 98 percent. After receiving results of the test, Mr. Whittaker treated the seed with insecticides and fungicides to protect the seed. Pursuant to its usual practice, LGG then sent a sample of the treated seed to the lab for germination testing. The report for that test, issued November 4, 1991, stated the germination rate for the treated Lot 3 seed was 82 percent. In order for seed to be certified in either Washington or Idaho, the germination rate must be at least 85 percent.

On October 10, 1991, Mr. Cox made arrangements to pick up a load of certified seed in Idaho. Mr. Whittaker loaded 9,300 pounds of treated seed from Lot No. 44A/3161 (Lot 3161) into Mr. Cox's truck. He issued a delivery ticket to the truck driver stating the seed was certified. The ticket also disclaimed any express or implied warranties, and limited LGG's liability to the purchase price of the seed. The terms on the ticket were never discussed. Thereafter on specified dates, Mr. Cox picked up certified

seed in Idaho, all from Lot 3: October 26, 1991 (16,020 pounds); November 15 (15,680 pounds); November 17 (18,140 pounds); November 23 (22,920 pounds). He also picked up 5,360 pounds of certified seed on November 15 from Lot 3161. Mr. Cox received a delivery ticket containing the disclaimer and limited remedy clause for each pick up. He did not receive any bulk sale certificates. Mr. Cox was never told that the minimum germination level was not met on the treated seed. One LGG representative stated he would not have sold the Lot 3 seed as certified given the treated seed test results. Mr. Cox paid for all of the seed.

Mr. Cox seeded 856 acres of his land with Lot 3 seed; 240 acres with Lot 3161 seed, and 6 or 7 acres with seed from another supplier. Weather problems caused Mr. Cox to begin his seeding later than normal. In January 1992, he noticed the acreage that was planted with Lot 3 seed did not have a normal stand. Mr. Cox then contacted Dave Storm of Western Farm Services regarding this crop problem. Chad Shelton, an agronomist with Western Farm Services, went to the Cox farm to examine the crop. Mr. Shelton discovered that the Lot 3 seed had poor emergence, but the non-Lot 3 seed crops planted in the same conditions were doing fine.

Mr. Cox contacted Mr. Whittaker about the crop problems. In February 1992, Mr. Cox and Mr. Shelton met with LGG representatives, Messrs. Whittaker, Mingo and Cannon, to examine the crops. Mr. Cannon collected samples from the fields for testing, but they could not be tested. He then took some Lot 3 seed from LGG's inventory and sent it to Washington State University (WSU) for analysis. Mr. Cannon then met with Mr. Cox and asked him to sign a letter in which LGG disclaimed any seed problem, but agreed to provide barley for reseeding on a deferred billing plan. Mr. Cox refused to sign the letter.

The WSU tests indicated the germination rate for the treated seed from Lot 3 ranged from 22 to 24 percent. Mr. Cannon did not give this information to Mr. Cox. Mr. Can-

non then requested additional tests. These tests showed a germination rate of 42 percent. These tests also stated there was extensive seed damage to the seed coat which adversely affected germination. Mr. Cannon did not disclose these test results either. All the fields Mr. Cox planted with Lot 3 seed were deemed total losses, and he was advised to reseed the fields with spring barley. LGG provided the barley seed to Mr. Cox without making any agreements as to payment. LGG received six or seven other complaints about Lot 3 seed, and all complainants received free barley seed.

Mr. Cox had a crop insurance policy with Continental Insurance which covered the wheat crop in question. The policy insured against crop loss due to environmental causes. The policy did not provide relief for losses due to seed problems. Mr. Cox submitted a claim to Continental which attributed his loss to environmental causes. He also submitted a claim for the crop loss due to environmental causes to the federal Agricultural Stabilization and Conservation Service (ASCS). Mr. Cox recovered $52,241 from Continental, and $11,889 from ASCS.

Mr. Cox also sued LGG for money damages alleging Seed Act violations, CPA violations, breach of warranty, and negligence. He claimed damages for the crop failure equaling $106,631.97. He also claimed a $9,185.36 loss from having to plant barley seed, and $8,898.15 for the cost of the defective seed for a total loss of $124,715.48. After a bench trial, the court entered judgment in favor of Mr. Cox for $146,930.93. The award included his attorney fees and costs. LGG now appeals.

■■■ The first question before this court is whether Idaho or Washington law should apply to the disclaimer of the warranty of merchantability and the limitation of remedies clause (exclusionary clause) contained in the delivery ticket. A court will engage in a choice of law analysis when an actual conflict exists between Washington law and the law of another state. *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 210, 875 P.2d 1213 (1994). When no conflict

exists, Washington law applies. *Id.* When a conflict does exist, the law of the forum which has the most significant contacts to the action will apply. *Id.* at 213.

The first inquiry for this court is whether a conflict exists between Washington and Idaho law regarding the warranty disclaimer and the exclusionary clause in the contract. In both states the Uniform Commercial Code Article 2 would apply to this transaction because it involves a sale of goods. RCW 62A.2-102; Idaho Code § 28-2-102. Under Article 2, in either state, a seller may disclaim the warranty for merchantability so long as it states the word "merchantability" and is conspicuous. RCW 62A.2-316(2); Idaho Code § 28-2-316(2). Idaho applies the requirements of the statute only in interpreting warranty disclaimer cases. *See Myers v. A.O. Smith Harvestore Prods., Inc.*, 114 Idaho 432, 757 P.2d 695, 700 (1988); *Snake River Equip. Co. v. Christensen*, 107 Idaho 541, 691 P.2d 787, 795-96 (1984); *Glenn Dick Equip. Co. v. Galey Constr., Inc.*, 97 Idaho 216, 541 P.2d 1184, 1194 (1975). Idaho courts also strictly construe limitation of remedy clauses. *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784, 796-97 (1978). Washington disfavors disclaimers and finds them to be ineffectual unless they are explicitly negotiated and set forth with particularity. *Berg v. Stromme*, 79 Wn.2d 184, 196, 484 P.2d 380 (1971) (*Berg* rule). *See also Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 261, 544 P.2d 20 (1975). Washington also requires that any exclusion of remedies be explicitly negotiated and set forth with particularity. *Baker v. City of Seattle*, 79 Wn.2d 198, 484 P.2d 405 (1971). Thus, Washington's requirements for disclaimers and limitations on remedies differ from Idaho's rules, and an actual conflict exists between the laws of the two states.

■ Next, we must determine whether Washington or Idaho has the most significant relationship to the transaction. *Pacific Gamble Robinson Co. v. Lapp*, 95 Wn.2d 341, 343, 622 P.2d 850 (1980). When making that determination, a court should consider: (1) the place of contracting;

(2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.* at 346 (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188, at 575 (1971)). The contacts with the states are used as guidelines to determine what the interests are of each state involved in the transaction. *Id.* In addition to the contacts with each state, the court also should consider the competing policy interests of the two states. *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 520, 832 P.2d 537 (1992), *aff'd*, 123 Wn.2d 93, 864 P.2d 937 (1994).

The place of contracting in this case was Idaho; Mr. Cox went to Idaho to purchase the seed on five occasions. The place of negotiating was Washington; Mr. Whittaker went to Mr. Cox's farm in Washington several times specifically to convince Mr. Cox to purchase his winter wheat seed from LGG. The contract was performed in Idaho; Mr. Cox purchased and received the seed in Idaho. The location of the subject matter of the contract was both states; the seed in question was treated and sold in Idaho, but used in Washington. The location of the parties is also split; Mr. Cox is a Washington resident, while LGG is an Idaho corporation licensed to do business in Washington. The facts establish both Washington and Idaho have significant contacts with this transaction.

██ ██ Turning to policy matters, Washington has an interest in regulating the actions of corporations authorized to do business in this state and to insure the employment of fair business practices. *Granite Equip. Leasing Corp. v. Hutton*, 84 Wn.2d 320, 326, 525 P.2d 223, 72 A.L.R.3d 1172 (1974). Washington also has an interest in protecting the agricultural industry in this state. In fact, the Legislature has enacted a body of law regulating the sale and movement of agricultural seed to provide uniformity in the packaging of agricultural seed, and protect consumers. RCW 15.49.005. Thus, Washington has a strong interest in this transaction. Idaho, likewise, has

an interest in regulating business in its state, but other than the sale, this transaction had little effect in Idaho. Mr. Cox used the seed in Washington, a fact known to LGG, and the crop failure occurred in Washington. LGG was also authorized to do business in Washington, and as a result is subject to the laws of this state. *See* RCW 23B.15.050. Washington has significant contacts with this transaction, and a significant policy interest. The court did not err by concluding Washington law applied.

■ The remaining issues deal with the court's conclusions of law. An appellate court reviews a trial court's conclusions of law to determine if the findings of fact support those conclusions. *In re Foreclosure of Liens*, 123 Wn.2d 197, 202, 867 P.2d 605 (1994). Findings of fact will be upheld so long as they are supported by substantial evidence. *Id.*

■ LGG contends the court erred by concluding the disclaimer and limitation of remedies were not specifically negotiated. Disclaimers of the warranty of merchantability must use the word "merchantability" and be conspicuous. RCW 62A.2-316(2). Disclaimers on goods purchased for consumers rather than commercial use are not effective unless the disclaimer sets forth with particularity what aspects of the goods are not being warranted. RCW 62A.2-316(4). Additionally, disclaimers are disfavored in the law and ineffectual unless specifically negotiated between the buyer and seller. *Berg*, 79 Wn.2d at 196. The codification of the rule that disclaimers must be set forth with particularity in consumer transactions has not altered the *Berg* rule. *Thomas v. Ruddell Lease-Sales, Inc.*, 43 Wn. App. 208, 213-14, 716 P.2d 911 (1986). The *Berg* rule has also been extended to cases involving limitations of remedies (exclusionary clauses) under RCW 62A.2-719(3). *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 223, 797 P.2d 477 (1990).

LGG contends the *Berg* rule does not apply to this case because it involves a commercial rather than a consumer transaction. The *Berg* rule has been applied to commercial

transactions when both parties were businessmen. *American Nursery Prods.*, 115 Wn.2d at 223. The rule operates to prevent one party in a commercial transaction from being harmed by unfair surprise. *Id.* However, the rule has not been applied in all commercial transactions, and courts are reluctant to extend the rule. *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 401-02, 759 P.2d 418 (1988). In *Berg*, the buyer purchased an automobile and negotiated for many variable items, such as color, size, power, and additional equipment. *Berg*, 79 Wn.2d at 194. *Berg* held that when a buyer communicates his particular needs to a seller, boilerplate disclaimers should not be effective. *Id.* at 196. While courts have refused to apply this rule to some commercial transactions, those transactions were dissimilar to *Berg*. *See, e.g., Travis*, 111 Wn.2d at 402 (*Berg* rule should not apply to auctions because no negotiations in any form exist); *Frickel v. Sunnyside Enters., Inc.*, 106 Wn.2d 714, 721, 725 P.2d 422 (1986) (*Berg* rule did not apply to sale of apartment complex because of a clause stating seller made no promises about the condition of the complex).

This case is similar to *Berg*. Mr. Cox wanted to purchase a specific type of seed, Stephens variety certified. The variety and certification were important to Mr. Cox. LGG sold him the seed as certified. Regardless of whether this is a consumer or commercial transaction, the *Berg* rule should apply due to the specific requirements of the sale. No negotiations occurred regarding the disclaimer or exclusionary clause contained in the delivery ticket. The court did not err by concluding the disclaimer was unenforceable.

■■ Exclusionary clauses in commercial transactions are prima facie conscionable. *American Nursery Prods.*, 115 Wn.2d at 222. The party attacking the clause has the burden to show the clause is unconscionable. *Id.* In determining conscionability the court must consider (1) the manner in which the contract was entered; (2) whether the parties had a reasonable opportunity to understand the terms of the contract; and (3) whether important terms

were hidden in fine print. *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 260, 544 P.2d 20 (1975). No one factor is conclusive. The court looks to the totality of the circumstances when determining conscionability. *Id.*

First, lengthy negotiations did not precede the transaction between Mr. Cox and LGG. Mr. Cox and LGG entered into the contract when the seed was picked up from the LGG facility. The evidence established that Mr. Whittaker never discussed the terms on the delivery ticket with Mr. Cox. Mr. Cox was not made aware of the terms at any time. LGG represented that the seed Mr. Cox received was certified. Secondly, Mr. Cox had limited opportunity to familiarize himself with the terms. Mr. Cox did not receive the terms on the delivery ticket until he picked up the seed. He did not pick up the seed himself the first time. Mr. Cox planted the seed soon after he received it. Although a party needs only an opportunity to read the terms, *American Nursery Prods.*, 115 Wn.2d at 225, Mr. Cox had little opportunity to familiarize himself with the terms before he planted the seeds. Thirdly, however, the terms were not hidden in fine print. Considering the totality of the circumstances, the court did not err in finding the exclusionary clause unconscionable.

██ ██ A party defending a clause may prove conscionability if the commercial setting indicates a prior course of dealing or reasonable trade usage of the clause in question. *Id.* at 223. There was no prior course of dealing between Mr. Cox and LGG. No evidence was presented of trade and usage. LGG argues it attempted to enter evidence of trade and usage but the court erroneously excluded the evidence. Evidence of usage of trade offered by one party is not admissible unless and until the other party has received notice and the court finds no unfair surprise exists. RCW 62A.1-205(6). Official comment 1 to U.C.C. § 1-205(6) suggests pleading usage of trade will give notice. LGG made no such pleading. LGG attempted to introduce usage of trade on two occasions during Mr. Cannon's testimony. Until that time Mr. Cox had no notice of

such a defense. The court did not err in rejecting the evidence. Even if the evidence should have been admitted, the error would be harmless. An error is harmless if the outcome of the action was not affected. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). A dominant pattern of trade usage must be established to show conscionability. *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wn. App. 539, 547, 625 P.2d 171 (1981) (statements made by one witness was not sufficient to establish dominant pattern). Mr. Cannon's testimony alone would not have established a dominant pattern of trade usage. Thus, LGG did not present a valid defense to the unconscionability of the exclusionary clause.

Even if the exclusionary clause were deemed conscionable, it is unenforceable if it fails its essential purpose. *American Nursery Prods.*, 115 Wn.2d at 226. When a limitation of remedy clause deprives a party of the substantive value of its bargain, it is ineffectual. *Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977); *see also* U.C.C. § 2-719, official cmt. 1. A limitation of remedies fails its essential purpose when the defect is latent and non-discoverable upon reasonable inspection. *Marr Enters.*, 556 F.2d at 955. Here, the defect was in the germination level of the seed. The seed was sold as certified, but it did not meet threshold germination requirements. Mr. Cox could not have discovered this until he planted the seed and it did not produce an adequate crop. Thus, the remedy would fail its essential purpose. The court did not err in finding the exclusionary clause was not enforceable.

LGG also contends the court erred by concluding it breached an express warranty. An express warranty is any affirmation of fact or promise made by the seller to the buyer relating to the goods and becoming the basis of the bargain. RCW 62A.2-313(1)(a). An express warranty is also any description of goods made part of the basis of the bargain. RCW 62A.2-313(1)(b). The more specific a statement the more likely it is an affirmation. *Federal Signal*

*Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 424, 886 P.2d 172 (1994). A statement regarding the quality of seed can constitute a warranty. *Hartman v. Barnes Grain & Feed Co.*, 155 Wash. 394, 399-400, 284 P. 754 (1930) (seller's statement that seed was good was sufficient to send the question of the existence of an express warranty to fact finder).

Here, Mr. Cox clearly indicated he wanted to buy only certified seed. LGG, through statements by its employees, its delivery tickets and its invoices, represented to Mr. Cox that the seed was in fact certified. The treated seed did not satisfy minimum germination requirements for certified seed. LGG promised to provide a certain quality of seed to Mr. Cox and it failed to do so.

LGG relies on Idaho law to support its argument that no express warranty existed; however, Washington law applies to these transactions. LGG also contends the conclusion is not supported by the findings of fact because the court never found that the seed was not certified. The court did enter findings which stated the level of the germination tests of Lot 3 seed, Mr. Cox's request for certified seed, LGG's promise to supply certified seed, LGG's representations that the seed was certified, and statements as to minimum levels for seed certification. The findings support the conclusion that an express warranty existed and was breached.

██ LGG next contends the court erred by concluding it violated both the Seed Act and the CPA because its certified label constituted a misleading advertisement. It is unlawful for any person in this state to disseminate, in any manner, any false or misleading advertisements concerning agricultural seeds. RCW 15.49.051(6)(b). An advertisement includes all representations made about the product, other than those made on the label. RCW 15.49.011(1). A label includes any tags or written documents accompanying seed. RCW 15.49.011(18). The court, in its findings of fact, stated that Mr. Whittaker told Mr. Cox in Washington that LGG would have sufficient quanti-

ties of certified Stephens variety seed for sale. This finding was not challenged and constitutes a representation made in Washington about the seed quality. Additionally, the court found that the LGG invoice billing Mr. Cox for certified seed was sent to his home in Washington. This also constituted a representation about the seed quality in Washington.

In order for seed to be labeled as certified, it must have a minimum germination level of 85 percent. WAC 16-316--724. The germination test must have been conducted within 15 months prior to the sale. RCW 15.49.051(1). Although the first germination tests resulted in acceptable levels, the test on the treated seed did not meet minimum requirements for certification. Whether or not required, LGG performed the second test as part of its regular business practices. When it received the results, it knew the seed did not meet the minimum requirements for certification. Regardless, they still made the representation to Mr. Cox that the seed was certified on its invoice. The court did not err in concluding LGG violated RCW 15.49.051(6)(b).

LGG also contends the court erred by concluding it violated the Seed Act and the CPA for failing to conform to purity, identity and variety requirements. It is unlawful to represent seed as certified unless it conforms to purity, identity or variety standards. RCW 15.49.051(3). Although the court stated that this section of the statute was violated, no findings of fact were entered to support this conclusion of law. Further, no evidence in the record dealt with the purity, identity or variety of Lot 3 seed. Thus, the court erred. However, the error was harmless because the court properly concluded other sections of the statute were violated. *Jackson,* 102 Wn.2d at 695.

LGG contends the court erred by concluding it violated the Seed Act and the CPA by labeling and selling the seed as certified and not informing Mr. Cox of the germination rate of the treated seed. It is unlawful to sell agricultural seed within this state if it is not labeled in accordance

with this chapter, or has a false or misleading label. RCW 15.49.051(2). The label must contain the name and address of the person labeling the seed, the name and address of the person selling the seed, the lot number of the seed, the origin of the seed, the germination rate, and the date of the germination test. RCW 15.49.031. Information required on the label of packaged treated seed shall appear on the invoice or other document accompanying the seed. WAC 16--318-080.

LGG was authorized to do business in Washington, and was obligated to comply with Washington law. *See* RCW 23B.15.050. The delivery tickets were the documents accompanying the sale of the seed. The delivery tickets do not meet the labeling requirements because they do not list any germination test level as required by RCW 15.49.031. WAC 16-318-080 also requires that documents accompanying the seed meet the label requirements. The court did not err in concluding LGG violated the labeling requirements.

LGG further contends the court erred by failing to conclude the defenses of good faith interpretation of law and reasonable business practices applied to LGG's actions and insulated them from liability under the Seed Act and the CPA. A CPA claim requires a showing of (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) affecting the public interest, (4) injuring the plaintiff's business or property, and (5) a causal link between the business practice and the injury. *Travis v. Washington Horse Breeders Ass'n*, 111 Wn.2d 396, 405, 759 P.2d 418 (1988). LGG's practice of testing both untreated and treated seed, but using the untreated seed test results as the basis for determining certification, could be considered a deceptive act. Trade or commerce includes the sale of assets which directly or indirectly affects Washington residents. RCW 19.86.010(2); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986). LGG sold the seed to a Washington farmer, thus it affects trade and commerce.

The third element may be met by showing a violation of a statute which protects the public interest. *Id.* at 791. The Seed Act, RCW 15.49.005, protects the public interest. Since LGG violated the Seed Act, the public interest element is met. LGG also acted in the scope of its business, and solicited Mr. Cox's business, satisfying two of the factors necessary to establish a public interest. *Hangman Ridge*, 105 Wn.2d at 791. Mr. Cox was injured, and LGG's practice of selling treated seed as certified without germination test results caused the injury. Thus, without a defense, LGG violated the CPA.

■ The CPA should not be construed to prohibit acts or practices which are reasonably related to the development and preservation of business, or which are not injurious to the public interest. RCW 19.86.920. Acts which are done in good faith under an arguable interpretation of the law are not CPA violations. *Perry v. Island Sav. & Loan Ass'n*, 101 Wn.2d 795, 810, 684 P.2d 1281 (1984). Acts which bear a reasonable relationship to the development and preservation of business are not CPA violations. *Travis*, 111 Wn.2d at 408. In determining if an act should be deemed a violation, a court must weigh public interest against a business' right to conduct its trade. *State v. Black*, 100 Wn.2d 793, 803, 676 P.2d 963 (1984).

The findings entered in this case state that LGG normally had germination tests performed on treated seed in order to comply with the law. An LGG employee stated that given the germination rate on the treated seed, he would not have sold the seed as certified. No evidence was presented that would support a conclusion LGG's practice of testing treated seed would constitute a defense to a CPA claim. The court did not err by failing to enter this conclusion of law.

■ Finally, LGG contends the court erred by holding that the Continental and ASCS payments were collateral source payments and did not reduce the damage award against LGG. The collateral source rule states that payments received by the injured party from a source inde-

pendent of the tortfeasor will not reduce recoverable damages from the tortfeasor. *Ciminski v. SCI Corp.*, 90 Wn.2d 802, 804, 585 P.2d 1182 (1978). This rule is designed to prevent the wrongdoer from benefitting from third-party payments. *Bowman v. Whitelock*, 43 Wn. App. 353, 357, 717 P.2d 303 (1986). The collateral source rule also operates to prevent a defendant from offsetting damages because the plaintiff received money under a personal insurance policy. *Wheeler v. Catholic Archdiocese*, 124 Wn.2d 634, 640, 880 P.2d 29 (1994).

Mr. Cox received payments for his crop damage under two insurance polices. The compensation was based upon his losses for the crop year due to environmental conditions. These payments were from sources independent of LGG. Mr. Cox's injury from the failed crops triggered his right to receive money under the insurance policies. While Mr. Cox may be receiving a windfall, that is permissible under the collateral source rule. If a windfall by one party is unavoidable, then the injured party is the appropriate person to receive the fortuitous benefit. *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 523, 844 P.2d 389 (1993).

 Mr. Cox received the insurance payments because of adverse environmental conditions. His damage claims at trial were based upon defective seed. LGG contends that because there was evidence at trial that weather was a factor in his loss, the insurance payments should not be considered collateral source payments. The findings recognize adverse weather conditions, but the court concluded defective seed was the predominant cause of the loss. Findings supported by substantial evidence will not be overturned on appeal. *In re Foreclosure of Liens*, 123 Wn. 2d 197, 202, 867 P.2d 605 (1994). Continental was Mr. Cox's crop insurance carrier and ASCS is a federal program which protects farmers from these types of losses. The payments from sources independent of LGG fall under the collateral source rule and LGG is not entitled to an offset.

Mr. Cox requests attorney fees on appeal under the CPA. Any person who is injured by a violation of the CPA

and brings a civil action under the CPA is entitled to costs associated with bringing the suit, including reasonable attorney fees. RCW 19.86.090.

We affirm. Mr. Cox's motion for attorney fees is granted and will be determined by a Commissioner of the Court of Appeals.

SCHULTHEIS, A.C.J., and MUNSON, J. Pro Tem., concur.

Review denied at 133 Wn.2d 1020 (1997).