

This opinion was filed for record

at $8:00\text{Am}$ on April 19, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| MICHAEL GILMORE, a single man, | ) | No. 94559-4 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| JEFFERSON COUNTY PUBLIC | ) | |
| TRANSPORTATION BENEFIT AREA, d/b/a | ) | |
| Jefferson Transit Authority, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| Respondent. | ) | Filed **APR 1 9 2018** |
| | ) | |

MADSEN, J.—In 2008, an employee of Jefferson County Public Transportation Benefit Area (Jefferson Transit) caused a vehicle collision with Michael Gilmore. Gilmore brought a personal injury suit against Jefferson Transit for injuries he allegedly sustained in that collision. At trial, the jury awarded Gilmore $1.2 million for past and future economic losses.

This case concerns three issues—whether the trial court abused its discretion (1) in excluding Dr. Allan Tencer's expert biomechanical testimony, (2) in barring evidence of

Department of Labor and Industries (L&I) payments to Gilmore, and (3) in determining that Gilmore's counsel's closing argument did not require a new trial.

In an unpublished decision, the Court of Appeals reversed, holding that the trial court abused its discretion with respect to each issue. *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, No. 48018-2-II, slip op. (Wash. Ct. App. Apr. 25, 2017) (unpublished), https://www.courts.wa.gov/opini-ons/pdf/D2%2048018-2-II%20Unpublished%20Opinion.pdf. We reverse the Court of Appeals.

## FACTS

### Background

Gilmore was stopped at a traffic light. Charles Cotterill, a Jefferson Transit employee, was driving a bus behind Gilmore. Cotterill failed to stop his bus in time and collided with Gilmore's vehicle. Gilmore was working for Brother's Plumbing and driving a van owned by his employer at the time of the collision. While the damage to both vehicles was minimal,[1] Gilmore described the collision as "devastating." 5 Verbatim Report of Proceedings (VRP) at 773.

Immediately after the collision, Gilmore was taken to the emergency room. He complained of nausea and headache, as well as pain in his neck, hip, and lower back. A few days later, Gilmore returned to the emergency room, complaining of headaches and numbness in his hands. As a result, Gilmore received L&I payments for wage loss and

---

[1] The cost to replace the bike rack on the front of Jefferson Transit's bus was $1,200, and Gilmore's employer never brought a claim against Jefferson Transit for any damage done to its van.

2

time loss. He also received a $40,000 lump sum L&I payment for permanent partial disability. Additionally, Gilmore was already receiving disability compensation from the Department of Veterans Affairs (VA). Gilmore was given a 60 percent disability rating for, among other things, degenerative arthritis in his thoracicolumbar spine, left elbow, and both of his hips and knees.

In April 2008, Gilmore underwent an MRI (magnetic resonance imaging), which revealed several disc bulges in his neck. In the following months, Jefferson Transit hired a private investigator to take video surveillance of Gilmore. The investigator documented Gilmore engaging in several physical activities. Gilmore's pain subsided until 2009 when he opened his own plumbing business and began working again. A subsequent MRI revealed that Gilmore's disc bulges worsened and required surgery. Gilmore did not get the recommended surgery at that time because he just started his own plumbing business and could not afford to take time away from work. Instead, Gilmore was prescribed opioids and placed on a "high risk medication management" program. He finally underwent neck surgery in 2015.

In 2010, Gilmore sued Jefferson Transit in the underlying action for his injuries. Jefferson Transit admitted liability for the collision but maintained that it did not cause Gilmore's injuries.

Pretrial

The trial court ruled on several motions in limine before trial. The court granted Jefferson Transit's motion to exclude "golden rule arguments," which are arguments

encouraging jurors to put themselves in Gilmore's place when deciding the case. Additionally, after reconsideration, the trial court granted Gilmore's motion to exclude evidence of his L&I and VA payments.

The trial court also granted Gilmore's motion to exclude Dr. Tencer's testimony. Dr. Tencer is a mechanical engineer and former professor who has done "research in the field of biomechanics related to injury prevention." Clerk's Papers (CP) at 365. He holds a bachelor's degree, a master's degree, and a PhD in mechanical engineering. Dr. Tencer is a well-known expert in Washington, having contributed biomechanical testimony in many personal injury cases. Dr. Tencer does not offer any medical opinion, but rather is primarily concerned with the severity of the impact in a given collision. His intended testimony here relates to a "quantitative description of the forces experienced by the Plaintiff in the crash and a comparison of those forces to forces of common experience." *Id.* at 366. In order to calculate a collision's impact, Dr. Tencer relies on several factors, including the "weights of the vehicles based on information provided by the automobile industry, the speed of the striking vehicle based on its level of damage, and the coefficient of restitution[,] which describes the elasticity of the impact and braking forces, to compute the speed change and acceleration of the struck vehicle." *Id.*

Before granting Gilmore's motion to exclude Dr. Tencer's testimony, the trial court engaged in a lengthy discussion with counsel. Gilmore's counsel argued that "Dr. Tencer's opinion [is] based on rank speculation and conjecture." 1 VRP at 35. He argued that Dr. Tencer's testimony would be irrelevant since he would not be offering

any information that the "jury can't figure out on their own." *Id.* at 37. Gilmore's

counsel suggested that there was enough other evidence for the jury to determine the

severity of the impact between the vehicles, including photographs of the collision and

testimony from Gilmore, a passenger on the bus, and potentially the bus driver.

Gilmore's counsel argued that Dr. Tencer's testimony is unreliable and would lend

scientific authority that is overly prejudicial.

In response, Jefferson Transit's counsel argued that the admissibility of Dr.

Tencer's testimony should be based on whether the court thinks it will be helpful to the

jury. In granting Gilmore's motion, the trial court explained:

> As far as what I can tell from what I read, and the way I understand
> it, um, he makes a number of assumptions, some of which are based on
> facts that are not going to be in evidence. And it does -- and he does create,
> um -- he does -- he does -- well, it's -- to me, it's intended to create an
> inference, um, of -- well, I don't know, it's create -- it's intended to create
> an inference with some aura of authority that I don't think is reasonable or
> justified. And I think that -- I think it will be confusing to the jury. I think
> that it will be misleading to the jury.
> And, um, so I'm going to grant the motion to exclude Dr. Tencer,
> based on -- based on what I -- what I read.

*Id.* at 39.

Trial

At trial, Gilmore's sons, Alex and Matthew Gilmore, each testified to Gilmore's

physical and mental condition after the collision. Alex Gilmore testified:

> Um, well, it was -- it was such a long time ago, but I do my best here, uh.
> He, well, wasn't able to work as soon as the collision happened. He had to
> stop working, uh. And he, pretty much, at -- things, kind of, hit the fan
> when, uh, he wasn't able to work. And, uh, it was hard to pay the bills.

5

He -- he and my mom didn't exactly get along very well for -- for much longer after [the collision] happened. Uh, lots of financial issues causing them to argue. And my dad and I, at one point, ended up, uh, moving out into a travel trailer, uh, with some friends and -- because of the arguments between them -- between my parents.

4 VRP at 508. And Matthew Gilmore testified:

Um, after the collision he started drinking. Uh, he, I guess, didn't feel like he was able to provide for his family the way he should and wasn't able to work. You know, he -- he was working 80 hours a week prior to the accident. Uh, sat records with Brother's Plumbing for, uh, installs on water heaters and all sorts of stuff.
Um, and to go from that to nothing he didn't know what to do. He went way downhill, uh, you know. You could see the sadness in his eyes. You could see the pain. Um, and he started drinking and eventually became addicted to it. I -- I guess he was addicted to it years and years and years ago. Uh, well before I was ever born, he quit and, uh, picked it back up. And that's when our relationship started going way downhill.

*Id.* at 532. After Matthew Gilmore's direct examination, Jefferson Transit argued that Alex and Matthew Gilmore's testimony opened the door to collateral source payments since it violated the motion in limine prohibiting any "mention of Plaintiff's financial status," and Jefferson Transit moved to allow evidence of Gilmore's L&I payments. *Id.* at 536. The trial court denied this request, but also explained:

[I]f there's a case out there that suggests to me that she's opened the door and this L&I stuff can come in, then it'll probably come in. But as of right now, I haven't seen that case or anything so I'm not going to go down that road.

*Id.* at 543.

Closing Argument

During closing arguments, Gilmore's counsel made some questionable statements to the jury. She said:

6

So what do we do? Do we let the government win?

. . . .

Mike can't fight the government alone. He can't.

. . . .

Can't fight the government. We certainly can't fight the government in this case without you. Because it's you who are going to determine the amount that's going to fairly and reasonably compensate Mike for these injuries.

7 VRP at 989, 991, 996. She added:

I'm going to tell you something, that there has been a fraud perpetuated in this courtroom during this trial. There has been. There has been someone in this trial who has continually tried to mislead you, who has continually thrown evidence at you to try to take you off what's really at issue in this case. And that's the Defense.

. . . .

I'm going to talk to you about some of the . . . frauds that the Defense has tried to perpetuate.

*Id.* at 978-79. And again on rebuttal, she said:

But that's what the government does. Why do they do that? They do that because no one holds them accountable. They do that because they can. They do that because nobody stands up and fights.

. . . .

. . . And you know that if you don't hold the government accountable, that they will just keep doing what they're doing. That they will feel like they can run into anybody in this community and just walk away.

*Id.* at 1031-32. Jefferson Transit's counsel did not object to Gilmore's counsel's closing argument or her rebuttal. Instead, he told the jury:

You know, it looks like a lot of theater. And you know what, you're right. A lot of this is theater. It's putting on a show. The attorneys are trying to persuade this jury. That's the whole point. And the reason jury trials work so well is because you've got somebody trying to persuade the jury this way, but somebody else trying to persuade the jury that way. And somehow the two kind of, you know, boil to the surface.

. . . .

One of the -- one of the techniques that lawyers use to persuade the jury is to, uh, try to turn the tables and -- and demonize the other side.

. . . .

Um, and then you demonize the other side by saying, well, it's the government. You can't fight the government. Look how bad they are. You know, look how nasty they are. They keep pointing to all this evidence and all these facts which are, uh, outrageous to us. You know, we don't like them. They don't like them because they reveal the truth of what's going on. But that's how -- that's how you present your case.

*Id.* at 1007-08.

<u>Verdict and Procedural History</u>

The jury found in Gilmore's favor, and awarded him $1.2 million for past and future noneconomic damages. Jefferson Transit subsequently moved for a new trial and remittitur. The trial court denied the motion because it did "not find, in the context of the entire record, that there was any event, misconduct, or discovery violation sufficient to justify a new trial or a remittitur." CP at 724.

Jefferson Transit appealed, and the Court of Appeals reversed in an unpublished decision. *Gilmore*, No. 48018-2-II, slip op. at 1. The Court of Appeals held that the trial court committed reversible error by excluding Dr. Tencer's expert testimony. *Id.* Additionally, it chose to address the admissibility of Gilmore's L&I payments and whether Gilmore's counsel's closing argument constituted misconduct. *Id.* at 19, 21.

Gilmore sought review of the Court of Appeals decision.

8

## ANALYSIS

### Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Ellis*, 136 Wn.2d 498, 504, 963 P.2d 843 (1998). "'A court abuses its discretion when an "order is manifestly unreasonable or based on untenable grounds."'" *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 668, 260 P.3d 874 (2011) (quoting *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993))). Rulings that are manifestly unreasonable or based on untenable grounds include those that are unsupported by the record or result from applying the wrong legal standard. *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017). Furthermore, "[a] reviewing court may not find abuse of discretion simply because it would have decided the case differently—it must be convinced that "'*no reasonable person* would take the view adopted by the trial court.'"" *Id.* (quoting *State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000) (quoting *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979))).

We also review the admissibility of expert testimony under this standard. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014) (citing *In re Marriage of Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012)). In this context, "[i]f the basis for admission of the evidence is "'fairly debatable,'" we will not disturb the trial

court's ruling." *Id.* (internal quotation marks omitted) (quoting *Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue,* 106 Wn.2d 391, 398, 722 P.2d 787 (1986)).

A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion. *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.,* 140 Wn.2d 517, 537, 998 P.2d 856 (2000). The pertinent inquiry is whether "'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.'" *Id.* (internal quotation marks omitted) (quoting *Moore v. Smith,* 89 Wn.2d 932, 942, 578 P.2d 26 (1978)).

Excluding Dr. Tencer's Testimony

The central issue in this case is whether the trial court abused its discretion in excluding Dr. Tencer's expert testimony. In Washington, trial courts generally look to three elements in determining the admissibility of expert testimony—whether

> (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact.

*Johnston-Forbes,* 181 Wn.2d at 352; *see* ER 702 (a qualified expert may testify if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

Dr. Tencer is often called to testify as an expert in Washington personal injury cases. Because the accuracy of using biomechanics to assess impact severity is controversial, courts disagree as to whether and under what circumstances to admit Dr. Tencer's expert testimony. For example, in *Johnston-Forbes,* the plaintiff in a personal

injury suit appealed a trial court ruling denying her motion in limine to exclude Dr.

Tencer's testimony. 181 Wn.2d at 351. In affirming, we held that trial courts have wide

discretion in determining the admissibility of biomechanical testimony, and that a trial

court does not abuse that discretion if it follows "the analytical framework required under

the ERs." *Id.* at 354. Understanding that the admissibility of such testimony could vary

from case to case, we added that it is "not remarkable that trial judges have sometimes

allowed biomechanical engineering testimony, and specifically Tencer's testimony,

where sometimes trial judges have excluded it." *Id.* at 353-54 ("'[t]he broad standard of

abuse of discretion means that courts can reasonably reach different conclusions about

whether, and to what extent, an expert's testimony will be helpful to the jury in a

particular case'" (quoting *Stedman v. Cooper*, 172 Wn. App. 9, 18, 292 P.3d 764

(2012))).

In *Stedman*, the trial court excluded Dr. Tencer's expert testimony, finding that it

may be more "misleading than helpful." 172 Wn. App. at 20-21. The Court of Appeals

in that case affirmed the trial court, holding that it did not abuse its discretion. *Id.* at 21;

*see Johnston-Forbes*, 181 Wn.2d at 358 (Yu, J., concurring) ("Moreover, our decision in

this case does not overrule *Stedman*.").

Here, Jefferson Transit complains that the trial court abused its discretion because

it failed to consider the ER 702 factors. It argues the trial court did not discuss the

scientific credibility of Dr. Tencer's testimony and did not address the analytical

framework set forth in case law for excluding experts or, indeed, any of the elements of

ER 702 in excluding Dr. Tencer's testimony. However, reading the trial court's ruling in conjunction with Gilmore's arguments, it is apparent that the trial court had these concerns in mind.

Specifically, Gilmore argued that

> [*Dr. Tencer*] *adds this sort of scientific authority.*
> *It's simply not reliable, and it is overly prejudicial* in that it gives an air of superiority to testimony that's . . . based on simply Dr. Tencer guessing as to the factors that would be involved.

1 VRP at 38 (emphasis added).

The trial court apparently agreed with Gilmore when it concluded that Dr. Tencer's testimony "intended to create an inference with some aura of authority that I don't think is reasonable or justified." *Id.* at 39. Indeed, Dr. Tencer's research is not without controversy. And, while the trial court did not mention ER 702, it also addressed the third element in the ER framework—whether the expert's testimony would be helpful to the trier of fact and explained the testimony would be confusing and misleading to the jury.[2]

---

[2] The Court of Appeals disagreed with the trial court's ruling:

> Tencer's testimony, however, was neither cumulative nor speculative. Because a disputed issue existed as to the cause and nature and extent of Gilmore's injury, Tencer's testimony would have allowed the jurors to make a more informed decision, especially given the contradictory evidence that the collision was not significant enough to cause injury. His testimony would have been subject to cross-examination and the weight of his testimony would have been determined by the jury.

*Gilmore*, No. 48018-2-II, slip op. at 17-18. But the appellate court may not substitute its judgment for that of the trial court. *See Salgado-Mendoza*, 189 Wn.2d at 427 ("A reviewing court may not find abuse of discretion simply because it would have decided the case differently.").

Jefferson Transit also argues that by excluding Dr. Tencer's testimony, it could not present its theory of the case—that the accident was minor and was not the cause of Gilmore's injuries. We disagree. Jefferson Transit stated that causation was a disputed issue and that its "theory of the case was that Mr. Gilmore's condition was preexisting, and that he was not injured in the impact." Suppl. Br. of Resp't at 12. Dr. Tencer's testimony does not include a medical opinion, likelihood of injuries sustained, or causation assessment. Rather, his testimony deals with his estimated severity of impact. Jefferson Transit had photographic and testimonial evidence to argue the speed of the vehicle and severity of impact.

Jefferson Transit further argues that the trial court abused its discretion by relying on the wrong legal standard. The Court of Appeals agreed the trial court excluded Dr. Tencer's testimony because he "made 'a number of assumptions, some . . . based on facts that [were] not going to be in evidence,'" which is not only the wrong legal standard, but rather, an acceptable form of expert testimony. *Gilmore*, No. 48018-2-II, slip op. at 17 (second alteration in original) (quoting 1 VRP at 39).

It is true that an expert may rely on facts not in evidence to formulate an opinion. ER 703. It is also true that the trial court noted that Dr. Tencer relies on facts not in evidence before it decided to grant the motion to exclude his testimony. However, as discussed, the trial court also excluded Dr. Tencer's testimony because it would create unreasonable inferences, and confuse and mislead the jury. Assuming the trial court incorrectly believed that Dr. Tencer could not base his testimony on facts not in evidence,

13

the trial court also stated other reasons for its ruling. "A trial court's ruling on the admissibility of evidence will not be disturbed on appeal if it is sustainable on alternative grounds." *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). Here, the trial court found Dr. Tencer's expert testimony to be unreliable, misleading, and confusing.

We find no abuse of discretion.

### Excluding L&I Payments

The admissibility of collateral source income, such as L&I payments, is governed by both the statutory and common law collateral source rules.

RCW 51.24.100[3] provides:

> The fact that the injured worker or beneficiary is entitled to compensation under this title shall not be pleaded or admissible in evidence in any third party action under this chapter.

*See Entila v. Cook*, 187 Wn.2d 480, 489, 386 P.3d 1099 (2017) ("[RCW 51.24.100] is unambiguous that an employee's receipt of benefits is inadmissible in a third party action"). The common law collateral source rule is consistent with RCW 51.24.100, in that we have generally held that evidence of collateral source income should be strictly excluded. *See Cox v. Spangler*, 141 Wn.2d 431, 439, 5 P.3d 1265, 22 P.3d 791 (2000), ("[C]ourts generally exclude evidence that the plaintiff has received compensation from a third party for an injury for which the defendant has liability. The 'rule is designed to prevent the wrongdoer from benefitting from third-party payments.'" (quoting *Cox v.*

---

[3] Jefferson Transit urges this court to hold that RCW 51.24.100 does not apply in situations where a plaintiff is requesting only general damages. We decline to do so. Neither our precedents nor the statute's plain text requires us to limit RCW 51.24.100's application to situations where the plaintiff requests special damages.

*Lewiston Grain Growers, Inc.*, 86 Wn. App. 357, 375, 936 P.2d 1191 (1997))); *see also*

*Johnson v. Weyerhaeuser Co.*, 134 Wn.2d 795, 798, 953 P.2d 800 (1998) ("In the context

of personal injury actions, the collateral source rule has been the rule in Washington for

85 years." (citing *Boeke v. Int'l Paint Co.*, 27 Wn. App. 611, 618, 620 P.2d 103 (1980)

("We agree that the rule of strict exclusion represents the better view."))).

While Jefferson Transit agrees with the general rule that evidence of collateral

source income is excluded, it argues that such evidence should have been admissible here

because Gilmore "opened the door." Jefferson Transit's argument relies on our decision

in *Johnson*, 134 Wn.2d at 804, where we held that a plaintiff may "waive the protections

of the collateral source rule by opening the door to evidence of collateral benefits."

However, we also held that the trier of fact is free to determine whether the door has been

opened. *Id.* We will not reverse the trial court's decision unless it abused its discretion.

*Johnston-Forbes*, 181 Wn.2d at 352. A trial court abuses its discretion in making

evidentiary rulings if those rulings are unsupported by the record or result from applying

the wrong legal standard. *Salgado-Mendoza*, 189 Wn.2d 427.

Jefferson Transit's first contention is that the trial court, in barring evidence of

collateral source income, applied the incorrect legal standard because it ruled that an

injured party "could *never* open the door to 'this L&I stuff.'" Suppl. Br. of Resp't at 7

(quoting 4 VRP at 543-44). We disagree.

The trial court stated:

> [F]or now, I'm going to . . . deny the request [to introduce collateral source evidence].

> . . . .
>
> . . . absent some case and authority on opening the door on the collateral source rule. . . . [I]f there's a case out there that suggests to me that she's opened the door and this L&I stuff can come in, then it'll probably come in. But as of right now, I haven't seen that case or anything so I'm not going to go down that road.

4 VRP at 543. In context, it is apparent that the trial court believed that there was insufficient basis to conclude that the door had been opened in this instance. Notably, Jefferson Transit was given the opportunity to provide some authority that suggested Gilmore opened the door to collateral source evidence and did not do so until after the jury reached its verdict.

Jefferson Transit also argues that in situations similar, where the injured party introduces evidence of financial hardship in violation of the collateral source rule and his own motion in limine, the court should allow the noninjured party to rebut that evidence to preserve fairness.

In *State v. Gefeller*, we held that "[i]t would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it." 76 Wn.2d 449, 455, 458 P.2d 17 (1969). However, in *Cox*, we held that even if collateral source evidence is relevant, in order to be admissible, such relevance must not be outweighed by the unfair influence this evidence would likely have had on the jury. 141 Wn.2d at 441.

Here, Gilmore's sons testified that these financial struggles adversely affected his mental health and personal life:

He, well, wasn't able to work as soon as the collision happened. He had to stop working . . . . And he, pretty much, . . . kind of, hit the fan when . . . he wasn't able to work. And . . . it was hard to pay the bills.

. . . [H]e and my mom didn't exactly get along very well . . . for much longer after [the collision] happened. . . . [L]ots of financial issues causing them to argue.

. . . .

. . . [A]fter the collision he started drinking. . . . [H]e, I guess, didn't feel like he was able to provide for his family the way he should and wasn't able to work. You know, he . . . was working 80 hours a week prior to the accident.

. . . [T]o go from that to nothing he didn't know what to do.

4 VRP at 508, 532. Jefferson Transit argues that it "sought to introduce evidence of Mr. Gilmore's L&I payments only to refute his testimony of his allegedly dire financial situation," and that "exclusion of that evidence significantly harmed Jefferson Transit's defense." Answer to Pet. for Review at 14. Admissibility of evidence is reviewed for abuse of discretion. *Salgado-Mendoza*, 189 Wn.2d at 427.

Whether the court abused its discretion will depend on the facts of each case. For example, in *Cox*, we found that evidence of collateral source income had "some marginal relevance regarding the apportionment of [the plaintiff's] damages, to show malingering, or to attack her experts' credibility," but were outweighed by the prejudicial effect on the jury. *Cox*, 141 Wn.2d at 441. Similarly, here, it is certainly possible for a person receiving L&I benefits to suffer financial struggle and stress. Moreover, introducing evidence of Gilmore's L&I payments does not necessarily rebut his sons' testimonies. The feelings associated with losing the ability to work and meaningfully provide for one's family are arguably not negated by L&I payments. And evidence of L&I payments arguably do not supplant the sense of purpose one may get from having a job and

responsibilities. Instead, such evidence may influence the jury into incorrectly believing that Gilmore endured no pain or suffering because he had some other sources of money.

Accordingly, we hold that the trial court did not abuse its discretion in barring Jefferson Transit from introducing evidence of Gilmore's L&I payments.

<u>Attorney Misconduct</u>

During closing arguments, Gilmore's counsel painted the government in a negative light and asked the jury to hold it responsible for the injuries sustained by Gilmore. Counsel also made several claims accusing Jefferson Transit of perpetrating a fraud in this case.

A trial court's decision to grant or deny a motion for new trial is reviewed for an abuse of discretion. *Alum. Co. of Am.*, 140 Wn.2d at 537. We will not disturb the trial court's decision unless "'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.'" *Id.* (quoting *Moore*, 89 Wn.2d at 942). The pertinent inquiry is whether Gilmore's counsel's statements prejudiced the jury to the extent that Jefferson Transit did not have a fair trial.

Here, in her closing argument, Gilmore's counsel said:

> Mike can't fight the government alone. He can't.
> . . . .
> . . . We certainly can't fight the government in this case without you.
> Because it's you who are going to determine the amount that's going to
> fairly and reasonably compensate Mike for these injuries.
> . . . [N]o one holds them accountable.
> . . . And you know that if you don't hold the government
> accountable, that they will just keep doing what they're doing. That they
> will feel like they can run into anybody in this community and just walk
> away.

7 VRP at 991, 996, 1031-32. Gilmore's counsel also added:

> I'm going to tell you something, that there has been a fraud perpetuated in this courtroom during this trial. There has been. There has been someone in this trial who has continually tried to mislead you, who has continually thrown evidence at you to try to take you off what's really at issue in this case. And that's the Defense.
>
> . . . .
>
> . . . I'm going to talk to you about some of the . . . frauds that the Defense has tried to perpetuate.

*Id.* at 978-79. Jefferson Transit's counsel did not object. Instead, he told the jury that this "looks like a lot of theater," and "one of the techniques that lawyers use to persuade the jury is to . . . demonize the other side." *Id.* at 1007. He concluded by saying, "[T]hen you demonize the other side by saying, well, it's the government. You can't fight the government. . . . But that's how . . . you present your case." *Id.* at 1008.

In denying Jefferson Transit's motion for a new trial, the trial court explained that "[t]his was a hard-fought case characterized by aggressive advocacy, but the Court does not find, in the context of the entire record, that there was any event, misconduct, or discovery violation sufficient to justify a new trial or a remittitur." CP at 724.

Unless some prejudicial effect is clear from the record, we must defer to the trial court. *See Clark v. Teng*, 195 Wn. App. 482, 492, 380 P.3d 73 (2016) (holding that "the trial court is 'in the best position' to gauge the prejudicial impact of counsels' conduct on the jury. Particularly when the grounds for a new trial involve the assessment of misconduct during the trial and its potential effect on the jury" (footnote omitted)).

Nothing in the record suggests that Gilmore's counsel's closing argument was incurably prejudicial.[4] We have held that "the lack of a clear and prompt objection is strong evidence that counsel perceived no error." *In re Det. of Black*, 187 Wn.2d 148, 154, 385 P.3d 765 (2016), *review granted*, 189 Wn.2d 1015, 404 P.3d 480 (2017). In other words, this rule is meant to prevent parties from "'wait[ing] and gambl[ing] on a favorable verdict' before claiming error." *Teter v. Deck*, 174 Wn.2d 207, 225, 274 P.3d 336 (2012) (quoting *Nelson v. Martinson*, 52 Wn.2d 684, 689, 328 P.2d 703 (1958)). Here, after closing arguments but before the jury delivered the verdict, the trial judge gave Jefferson Transit a final opportunity to object. The trial judge asked, "[I]s there anything we need to put on the record or do? . . . [A]nything else?" VRP at 1036-37. Jefferson Transit's counsel responded "[n]o" both times. *Id.* at 1037.

By rationalizing Gilmore's counsel's statements as a "technique" and failing to object after being given several opportunities, it is clear that Jefferson Transit's counsel perceived no error and was "gambling on the verdict."

We hold that the trial court did not abuse its discretion in denying Jefferson Transit a new trial on the basis of counsel's remarks.

---

[4] The Court of Appeals also held that despite Jefferson Transit's failure to "object to these remarks, the issue can still be raised on appeal because the lawyer's misconduct was so flagrant and ill-intentioned that no curative instruction could have obviated the prejudice engendered by the misconduct." *Gilmore*, No. 48018-2-II, slip op. at 24. We disagree and decline to reach what appears to be Jefferson Transit's independent argument based on attorney misconduct since these remarks were raised in Jefferson Transit's motion for a new trial, and we find the trial court did not abuse its discretion in denying a new trial.

## CONCLUSION

We reverse the Court of Appeals and hold that the trial court did not abuse its discretion in its evidentiary rulings or in its denial of a motion for a new trial.

.

No. 94559-4

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Owens, J._

_Stephens, J._

_Wiggins, J._

_González, J._

_Good, McCloud, J._


22

No. 94559-4

YU, J. (concurring)—I concur with our affirmance of the trial court's

evidentiary rulings and write only to emphasize the importance of carefully

evaluating proposed expert testimony to determine its relevance and admissibility

in each individual case. The trial court in this case correctly found that Dr. Allan

Tencer's proposed testimony would be "confusing" and "misleading" because it

invited the jury to draw unjustified conclusions based on unreasonable inferences

with no supporting evidence. 1 Verbatim Report of Proceedings (June 5, 2015) at

39. The court therefore properly excluded this testimony as irrelevant.

The only disputed issues in this case were the extent of Michael Gilmore's

injuries and the amount of his damages. While Dr. Tencer admitted that the

dispute is "the severity of injury," he described his proposed testimony as relating

only to "the severity of the impact," that is, "the forces of the collision and the

forces experienced by the Plaintiff." Clerk's Papers at 365. Therefore, according

to Dr. Tencer, the proposed testimony was "not medical," but was intended to "help the jury assess the validity of the opinions of the Plaintiff's and Defendant's medical doctors." *Id.* at 365-66.

Dr. Tencer provided no factual foundation and pointed to no reliable evidence regarding the forces actually experienced by Mr. Gilmore in this particular accident. Instead, he asserted that he "compute[s] the speed change" of a vehicle following a crash by applying "engineering principles" based on the vehicle's weight (according to the automobile industry), the speed of the impact (based on the amount of damage to the vehicle), and the "elasticity of the impact." *Id.* at 366. He then uses that calculation to determine the force experienced by the victim based on the design and placement of restraints in the vehicle and the injured person's "age, weight, and height." *Id.*

In light of this explanation, the trial court properly did not credit Dr. Tencer's assertion that his proposed testimony "is not related to any averages." *Id.* at 365. To the contrary, it is clear that Dr. Tencer intended to import "average person" studies of vehicle crash tests to speculate what the transfer of energy *might* have been in this case and, assuming that initial speculation was accurate, whether the impact on Mr. Gilmore could *really* have caused the alleged injuries.

This testimony would not have been helpful to the jury in determining the actual level of injury sustained by this particular plaintiff in this particular accident.

However, that is always the actual question at issue because all personal injury defendants must take all plaintiffs as they are, even if the plaintiff is not an average person. In other words, "[t]here is no 'one size fits all' approach to collisions or injury threshold levels." *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 358, 333 P.3d 388 (2014) (Yu, J., concurring).

An individualized inquiry into the severity of injuries caused by a particular crash is properly within the province of the jury. The trial court in this case properly determined that the jury would not benefit from Dr. Tencer's speculative conclusions and therefore properly excluded his proposed testimony. To do otherwise might well have been an abuse of discretion.

I respectfully concur.

4